**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

MOUNT OLIVET CEMETERY
ASSOCIATION, a Utah non-profit
corporation; JOHNSON LAND
ENTERPRISES, LLC, a Utah limited
liability company,

    Plaintiffs-Appellants,

       v.

SALT LAKE CITY, a Utah
municipality,

    Defendant-Appellee.

No. 97-4078

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 96-CV-196-C)

---

Jay D. Gurmankin, (Daniel L. Berman, Peggy A. Tomsic, and Daniel S. Day with
him on the brief), of Berman, Gaufin, Tomsic & Savage, Salt Lake City, Utah, for
the appellants.

Steven W. Allred, Chief Deputy City Attorney, Salt Lake City, Utah, for the
appellee.

---

Before **BRORBY, McWILLIAMS,** and **BRISCOE**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

Plaintiffs Mount Olivet Cemetery Association and Johnson Land Enterprises appeal the district court's entry of summary judgment in favor of defendant Salt Lake City in plaintiffs' action seeking declaratory judgment and injunctive relief. Plaintiffs contend the district court erred in finding the Association was the owner of the Mount Olivet Cemetery property, and, as applied to the Association, the City's local zoning ordinance was not preempted by federal law. We affirm.

In 1874, Congress authorized the Secretary of War to set aside twenty acres of land at Camp Douglas in Salt Lake City, Utah, for use as a public cemetery, and directed the Secretary to establish rules and regulations "for the protection, care, and management of such cemetery." See Act of May 16, 1874, ch. 180, 18 Stat. 46-47 (1875). On January 22, 1877, the Secretary designated the cemetery land and promulgated regulations governing its use. The regulations vested management of the cemetery in a board of directors and authorized the board to adopt rules not inconsistent with the regulations. All revenues generated by the sale of burial plots were to be retained by the cemetery and no funds were to "be diverted or devoted to any other use or purpose whatever." Appellant's App. at 106. The board had "no power to create any debt, liability or obligation for the payment of money which shall be binding on this [War] Department or upon the United States," and it was not "to incur any liability greater than it [had] the

-2-

present means of defraying." <u>Id.</u> The regulations appear to be in effect today.

Congress did not act again with respect to the cemetery until 1909 when it directed the Secretary to convey the cemetery land to Mount Olivet Cemetery Association in exchange for land to be conveyed to the government. <u>See</u> Act of January 23, 1909, chap. 37, 35 Stat. 589 (1909). The 1909 Act provided in part:

> [T]he Secretary of War, for and on behalf of the United States, is hereby authorized and directed to grant and convey by deed to the Mount Olivet Cemetery Association, of Salt Lake City, Utah, the [cemetery] land . . . . Said land to be by the said Mount Olivet Cemetery Association permanently used as a cemetery for the burial of the dead: *Provided* , That when it shall cease to be used for such purpose it shall revert to the United States.

<u>Id.</u> In 1914, and again in 1952, Congress explicitly allowed use of the land for specific non-cemetery purposes. In 1914, Congress granted the Emigration Canon Railroad Company a right-of-way over the cemetery land "so far as the United States is concerned." Act of February 3, 1914, chap. 14, 38 Stat. 279 (1914). In 1952, Congress "authorized" the Association to grant and convey a small portion of the cemetery land to the City of Salt Lake for expansion of Sunnyside Avenue, which bordered the cemetery. Act of April 3, 1952, chap. 130, 66 Stat. 36 (1952). In the 1952 Act, Congress waived the "reversionary clause set forth in the Act of January 23, 1909," provided that the City use the land for "street or highway purposes," and declared that the 1952 Act "shall not alter or affect Mount Olivet Cemetery Association's ownership of, or its rights and privileges with respect to,

-3-

the remainder of the lands heretofore granted to it by the United States."    Id.

The Association incorporated as a non-profit corporation under Utah law in 1985. In the late 1980's and early 1990's, the Association incurred substantial operating deficits that affected its ability to properly maintain the cemetery. The Association urged Utah congressional leaders to introduce legislation allowing non-cemetery use of property not currently needed for burial purposes. In 1992, Congress authorized such use.

> Notwithstanding the Act of January 23, 1909 (chapter 37, 35 Stat. 589), the Secretary of the Interior shall execute such instruments as may be necessary to allow the Mount Olivet Cemetery Association of Salt Lake City, Utah, to lease for use other than as a cemetery, for a period of not more than 70 years, any portion of the land described in the first section of that Act, excluding the tract of land granted to Salt Lake City, Utah, pursuant to the Act of April 3, 1952 (66 Stat. 36), so long as such additional use will not prevent future use for cemetery purposes.

Publ. L. No. 102-347, 106 Stat. 930 (1992).

In December 1993, the Association leased fifteen acres of the property to the Salt Lake City Board of Education for use as a football stadium. In February 1994, it leased a portion of the property to Careage, Inc., for construction of a skilled nursing facility. The City objected to this use, claiming "open space or recreation is the only allowable use with consideration of all the restrictions on the property." Appellant's App. at 97. Careage declined to develop the property because of the opposition.

-4-

In April 1995, new City zoning restrictions became effective and the Association's property was designated as "open space." "The purpose of [open space zoning] is to preserve and protect areas of public and private open space and exert a greater level of control over any potential redevelopment of existing open space areas." Appellant's App. at 172. Property designated "open space" can be used for cemeteries, community recreation centers, country clubs, golf courses, nature preserves, public parks, private recreational facilities, and zoos. See id. at 175-76. An "open space" designation prohibits use for residential or office use, including adult day care centers, congregate care facilities, and medical offices.

In December 1995, the Association leased twenty acres to Johnson Land Enterprises for construction of a retirement living center and skilled nursing facility. The lease required Johnson to "restore the Leased Premises to a condition suitable for the use by the Lessor as a cemetery for burial of the dead" upon termination of the lease.     Id. at 28. Johnson was also obligated under the lease to reimburse the Association for any attorney fees incurred in challenging the zoning classification. The Association submitted the lease to the Secretary of the Interior for a determination of whether the proposed use would prevent future use of the property for cemetery purposes. The Bureau of Land Management approved the lease in early 1996, declaring the proposed use consistent with

provisions of the 1992 Act. [1]

Plaintiffs initiated this declaratory and injunctive relief action on March 4, 1996, contending the property was federally-owned and governed by federal regulations. Plaintiff sought a declaration that (1) the City exceeded its authority under Utah Code Ann. § 10-9-105 by attempting to regulate federal property; and (2) the City's zoning ordinances, as applied to the Association, were preempted by federal law and thus unconstitutional under the Supremacy Clause. The City argued the Association owned the property and that the zoning ordinance was consistent with Utah law and any applicable federal regulation. In granting summary judgment in favor of the City, the court held the Association owned the property by virtue of the 1909 Act deeding the property to the Association, and at best the United States held a possibility of reverter. The court rejected plaintiffs' preemption arguments, noting there was "no federal scheme controlling the Mount Olivet property and no dominant federal interest." Appellant's App. at 761.

### Standard of Review

We review a grant of summary judgment de novo, applying the same legal

---

[1] The Bureau later clarified its position: "Our intent in executing this certificate [of approval] was to . . . certify that the proposed use was not for a cemetery, and that the lease was not to exceed 70 years. We consider the subject land to be private land with a reversionary clause to the United States . . . . No approval of the specific use is implied by the issuance of the certificate and there is no intent to override the authority of local jurisdictions to permit or approve the use of the property." Appellant's App. at 261.

standard used by the district court. Sundance Assocs., Inc. v. Reno, 139 F.3d 804, 807 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Sundance, 139 F.3d at 807.

### Ownership under Utah Code Ann. § 10-9-105

Initially, we must determine, for purposes of Utah Code Ann. § 10-9-105, who owns the property. "Unless otherwise provided by law, nothing contained in . . . this chapter may be construed as giving the planning commission or the legislative body jurisdiction over properties owned by the state of Utah or the United States government." Utah Code Ann. § 10-9-105. Thus, if the property is owned by the federal government, the City lacked authority to enforce its zoning designation of that property. Plaintiffs contend the government's future interest, coupled with its purportedly extensive regulation of the property, are sufficient to bring the property within the definition of "property owned by the United States." The district court's interpretation of § 10-9-105 is subject to de novo review. See F.D.I.C. v. Canfield, 967 F.2d 443, 445 (10th Cir. 1992).

Congress unambiguously conveyed ownership of the land to the Association through the 1909 Act and the subsequently issued deed. The deed "grants and conveys" the cemetery land to the Association until the land is no longer used as a cemetery, at which point it reverts to the government. Under well-settled rules of property law, the Association obtained a fee simple determinable via this conveyance, while the government retained a possibility of reverter. See Chester H. Smith & Ralph E. Boyer, Survey of the Law of Property 8 (2d ed. 1971). "A fee simple determinable is a fee simple created to continue until the happening of a stated event." Id. A possibility of reverter is merely the interest retained by a grantor after conveyance of a determinable fee. See Helvering v. Hallock, 309 U.S. 106, 118 n.6 (1940). It is a future contingent interest in real property, and, at best, a future estate in land. See Roger A. Cunningham et al., The Law of Property 39 (2d ed. 1993).

The federal government's limited interest in the property is insufficient to trigger the government ownership exclusion provision of § 10-9-105. The Association holds the property in fee simple, subject only to the qualifying limitations set forth in the 1909 and 1992 Acts. The Association has exclusive right of possession. In contrast, at present--indeed, for as long as the property is used as a cemetery and in accordance with the 1992 Act--the government has no right of possession. See id. at 85 (describing future interests, including

possibilities of reverter, as non-possessory interests). Any interest the federal government has is minimal and speculative, and inconsistent with a characterization of the property as property "owned . . . by the United States government." Utah Code Ann. § 10-9-105;       cf. Choctaw O. & G. R.R. Co. v. Mackey, 256 U.S. 531, 538-39 (1921) (describing railroad, which had "limited fee," as "absolute owner of land" in which Creek Nation had possibility of reverter); Midwestern Devs., Inc. v. City of Tulsa   , 374 F.2d 683, 687 (10th Cir. 1967); Woodville, Okla. v. United States   , 152 F.2d 735, 738 (10th Cir. 1946) (characterizing possibility of reverter as "not an estate or interest in the land, and so . . . not property in the constitutional sense").

Association ownership is further supported by language in the 1914 and 1952 Acts. In the 1914 Act, Congress granted the Emigration Canon Railroad Company permission to occupy a right-of-way only "so far as the United States is concerned." This language, which is not consistent with a plenary grant of authority, indicates Congress thought additional consent from the Association was necessary to secure the right-of-way. The 1952 Act references the Association's "ownership" of the property, and authorizes (but does not direct) the Association to grant and convey land to the City for street expansion. The Association could not grant and convey property it did not own.

In short, the 1909 Act and the deed transferred a fee simple determinable

estate to the Association.  The limited interest of the United States--its possibility of reverter--is immaterial with respect to the current right of possession and does not establish ownership of the property.  See Outerbridge Terminal, Inc. v. City of Perth Amboy , 432 A.2d 141, 144 (N.J. Super. 1980) (immunity from zoning based on governmental ownership is limited to actual ownership or leasehold interest and not on any interest short of those).  The property is therefore not a property owned by the United States for purposes of § 10-9-105.

### Preemption

Notwithstanding the Association's ownership of the property, the zoning ordinance is not applicable to the Association if preempted by federal law. Congress' power to preempt state and local law derives from the Supremacy Clause of the United States Constitution, which provides "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  Art. VI, cl. 2.  Preemption may occur in three situations: (1) express preemption, which occurs when the language of the federal statute reveals an express congressional intent to preempt state law (plaintiffs concede express preemption is not at issue here); (2) field preemption, which occurs when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it; and (3) conflict preemption, which occurs either when compliance with both the

federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. See Barnett Bank of Marion County v. Nelson, 517 U.S. 25, 31 (1996); United States v. City & County of Denver, 100 F.3d 1509, 1512 (10th Cir. 1996). Congressional intent is the touchstone of any preemption analysis. See Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 604 (1991). We review the district court's preemption determination de novo. See Fry v. Airline Pilots Ass'n Int'l, 88 F.3d 831, 835 (10th Cir. 1996).

Before considering the merits of plaintiffs' preemption claims, we first address plaintiffs' argument that the Association is a federal instrumentality. Designating an entity a federal instrumentality colors the typical preemption analysis by requiring the court to presume, in the absence of clear and unambiguous congressional authorization to the contrary, that Congress intended to preempt state or local regulation of the federal instrumentality. See Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp., 642 F.2d 527, 534-35 (D.C. Cir. 1980). Plaintiffs contend the Association is a federal instrumentality because "at the time of its creation it served a governmental function of providing a cemetery for the Utah non-Mormon community and the United States military." Appellant's Br. at 28. Plaintiffs concede "[t]here is no need for such a cemetery now," but claim the "cemetery, once created, represents a perpetual commitment,

-11-

a solemn obligation of the United States." Id.

There is no bright line rule or specific test to determine if an entity is a federal instrumentality. See T I Federal Credit Union v. Del Bonis, 72 F.3d 921, 931 (1st Cir. 1995). Courts therefore have looked to a variety of factors to make this determination. Id.; see Lebron v. National R.R. Passenger Corp., 513 U.S. 374, 397-98 (1995) (whether government officers handle and control its operations; whether officers of entity are appointed by government); United States v. Boyd, 378 U.S. 39, 45 (1964) (whether entity is organized for profit and using property "in connection with its own commercial activities"; United States v. Township of Muskegon, 355 U.S. 484, 486 (1958) (whether governmental control over entity is such that it "could properly be called a 'servant' of the United States in agency terms"); Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536, 539 (1946) (whether entity is supported by governmental aid; whether entity's profits are distributed to and its losses borne by government); Clallam County, Wash. v. United States, 263 U.S. 341, 343 (1923) (whether entity is owned by government); United States v. Michigan, 851 F.2d 803, 806 (6th Cir. 1988) (whether entity performed important governmental function).

Applying these factors, it is apparent the Association is not a federal instrumentality. Although it is a non-profit organization, the Association is an entity distinct from the government and, in fact, is chartered as a corporation

under Utah law.  The Association bears sole responsibility in conducting cemetery operations and carries out those operations free of federal government intrusion. Cf. Township of Muskegon, 355 U.S. at 486 (denying instrumentality status where entity free to use "property as it thought advantageous").  The Association has unfettered discretion in choosing how to maintain the cemetery and what prices to charge for services and burial plots.  The Association crafted its own articles of incorporation, adopted its own bylaws, and set its own regulations.  It established how Association directors are chosen and the length of the directors' terms.[2]  The Association receives no monetary support from the federal government.  Association revenues are not added to the federal treasury and its deficits are not borne by the federal government.  Century-old Association regulations clearly specify the Association cannot obligate the United States to pay any Association debt.

The Association and cemetery do not perform a significant or indispensable governmental function.  Although numerous veterans are buried at the property, the cemetery does not purport to be included in the National Cemeteries System,

---

[2]  Although the Secretary of War's 1877 regulations specified the "officer in command of the Military Post at Camp Douglas" was to be a member of the board of directors "so long as a Military Post shall be maintained" (Appellant's App. at 105), this sole regulation is insufficient to bestow federal instrumentality status upon the Association.  In any event, there has been no military member of the Association board since 1991 when Fort Douglas ceased to be maintained as a military post.

-13-

see 38 U.S.C. § 2400, and veterans have no preferred burial rights. Any individual may purchase a burial plot. Hence, the Association not only exhibits none of the indicia of a federal instrumentality, but is indistinguishable from a typical non-governmental non-profit organization operating a cemetery on private property. Therefore, we do not presume the zoning ordinance is invalid, but apply the traditional preemption analysis articulated above.

In the absence of an express preemption provision, state or local law may be preempted if it attempts to regulate conduct in a field that Congress, by its legislation, intended to be occupied exclusively by the federal government. See English v. General Elec. Co., 496 U.S. 72, 79 (1990). Field preemption may be inferred if a federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a state to supplement it or if an Act of Congress touches a field in which the federal interest is so dominant the federal system is assumed to prohibit enforcement of state laws on the same issue. See Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947).

Plaintiffs contend the federal government has regulated and controlled every facet and use of the property and has left no room for additional state or local regulation. Plaintiffs argue this extensive oversight is exemplified by the 1874 Act authorizing creation of the cemetery and specific allowance of the property for non-cemetery uses in subsequent Acts. Plaintiffs claim federal

-14-

regulation of the property is so pervasive that it precludes supplementation by the City in the form of its zoning ordinance.

We do not share plaintiffs' assessment of the various Acts at issue. Land use policy such as zoning customarily has been considered a feature of local government and an area in which the tenets of federalism are particularly strong. See Evans v. Board of County Comm'rs, 994 F.2d 755, 761 (10th Cir. 1993). A local government has broad power to implement its land use policies by way of zoning classifications. See Schad v. Borough of Mount Ephraim, 452 U.S. 61, 68 (1981). As such, we begin with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. Mortier, 501 U.S. at 605; Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 146-47 (1963) (preemption of regulation enacted pursuant to police power will not occur "in the absence of an unambiguous congressional mandate to that effect").

Whether considered separately or collectively, the Acts at issue do not remotely demonstrate a clear and manifest congressional intent to usurp all--or even any--local regulation of the property and place it in federal hands. The extent of federal involvement in regulation of the property is essentially limited to the 1874 Act authorizing the Secretary to set aside land for the cemetery and the 1877 regulations for the cemetery by the Secretary of War. Even the 1877

-15-

regulations, however, evince a congressional intent to separate the federal government from cemetery operations rather than draw the cemetery under the umbrella of federal oversight and supervision. See Appellant's App. at 101-07.

The 1909 Act is perhaps the most useful barometer of the lack of pervasive federal regulation. In the Act, Congress went so far as to transfer for infinity ownership of the cemetery to the Association, provided the land was perpetually used as a cemetery. The 1914, 1952, and 1992 Acts are best understood in context of the conveyance contemplated by the 1909 Act. The *only* federal action with respect to the cemetery since it was placed in private hands in 1909 has been passage of the 1914 and 1952 Acts expressly waiving the possibility of reverter for specific projects, and passage of the 1992 Act, which constituted a blanket prospective seventy-year waiver of the possibility of reverter with respect to a thirty-five-acre parcel of the property. These Acts hardly constitute pervasive regulation of the cemetery property and are patently insufficient to clearly and manifestly demonstrate a congressional intent to preempt the City's zoning ordinance.

As noted, conflict preemption occurs either when compliance with both federal and state laws is impossible or when state law stands as an obstacle to accomplishment and execution of the full purposes and objectives of Congress. There can be no question but that compliance with both the 1992 Act and the

-16-

zoning ordinance is possible.    Cf. Mortier , 501 U.S. at 614 ; Paul, 373 U.S. at 142-43.  The zoning ordinance does not prohibit use of open space for non-cemetery purposes; it merely limits the non-cemetery uses of the property.  Therefore, only the second facet of conflict preemption--the "obstacle" prong--is at issue here.

Plaintiffs complain the City's open space zoning designation frustrates and serves as an obstacle to accomplishment of Congress' intent, as expressed in the 1992 Act, that certain parts of the property be available for non-cemetery use. [3] As characterized by plaintiffs, the 1992 Act was designed not merely to allow non-cemetery use of the property, but to specifically allow "economic or commercial development" of the property sufficient to generate revenue to maintain the cemetery.  The open space zoning thus deprives plaintiffs of any meaningful opportunity to develop the property.

Plaintiffs read too much into the 1992 Act.  On its face, the Act does nothing more than authorize the Association "to lease for use other than as a cemetery, for a period of not more than 70 years," portions of the property, "so long as such additional use will not prevent future use for cemetery purposes." 106 Stat. 930.  One certainly cannot reasonably infer from this text that Congress

_____

[3] Plaintiffs complain the City intentionally acted to "nullify the federal scheme."  However, in making a preemption determination, it is not appropriate to consider the motive underlying the zoning decision.    See Blue Circle Cement, Inc. v. Board of County Comm'rs  , 27 F.3d 1499, 1508 (10th Cir. 1994) (evaluation of local ordinance should be conducted on objective rather than subjective basis).

-17-

was even concerned with revenue-generating use of the property. Like the 1914 and 1952 Acts, the 1992 Act appears to be nothing more than a waiver by the government of its possibility of reverter.

The legislative history is equally unavailing. In introducing the 1992 legislation, the Utah delegation did not remark on the Association's financial difficulties, but spoke only of the unkempt state of the property. Senator Orrin Hatch described the thirty-five-acre parcel as "a weeded, unattractive and insect-infested vacant lot," and claimed the legislation would permit the Association to utilize the property "in a worthwhile manner until" needed for burial purposes. 137 Cong. Rec. S4338-01, S4350 (April 11, 1991). Senator Hatch asserted the Association planned to develop "a golf teaching and practice facility" on the property that would turn "totally unproductive land into an attractive recreational amenity." Id. Representative Wayne Owens expressed similar sentiments in the House of Representatives, noting the Association supported the proposal to "turn this vacant lot into a golf facility." 137 Cong. Rec. E1292-01, E1292 (April 17, 1991). Additional speeches and other legislative materials likewise do not reference the need to use the land for revenue-generating purposes. See S. Rep. No. 102-205, 102nd Cong. (1992); H.R. Rep. No. 102-821, 102nd Cong. (1992).

Even ignoring the inadequacies of the statutory text and the legislative history, preemption is not warranted in these circumstances. Congressional

-18-

authorization for non-cemetery use cannot, in the absence of more persuasive evidence, be considered an unlimited congressional mandate authorizing any use--even a use otherwise prohibited by state or local law--that the Association desires to pursue. It is unlikely by this vague Act that Congress intended to deal the Association such a precious wild-card. Conflict preemption requires that the state or local action be a material impediment to the federal action, see Paul, 373 U.S. at 142, or "thwart[] the federal policy in a material way," Blue Circle, 27 F.3d at 1509. Yet, the City does not assert a right to regulate in any area that is regulated by the federal government. See Rice, 331 U.S. at 236 ("The test, therefore, is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act."). The open space zoning does not preclude the Association from productively using its property for non-cemetery uses, nor does it prohibit use of the property for revenue-generating purposes. Although the open space designation does not offer limitless revenue-generating options, many permitted uses of the open space are conducive to revenue generation, including recreation centers, country clubs, and golf courses. Therefore, the City's open space designation does not undermine or frustrate any discernable congressional policy or objective. See Paul, 373 U.S. at 142 (declaring preemption inappropriate if both regulations can be enforced without impairing federal superintendence).

Plaintiffs contend, in any event, the district court erred in entering summary judgment in favor of the City because the City did not come forward with evidence that its open space designation was a reasonable accommodation between its legitimate zoning interest and Congress' objective in authorizing reasonable commercial use of the property. Contrary to their protestations, however, there is no evidence in the record that plaintiffs raised this issue before the district court and we will not consider it on appeal. See In re Walker , 959 F.2d 894, 896 (10th Cir. 1992). [4]

Plaintiffs' reasonable accommodation argument is only one of various arguments they make that are unrelated to the narrow preemption issue before the court. In addition, they assert the Association property is the only property in the immediate area designated as open space and that the designation so denies the Association an economically viable use for its property that it constitutes a taking of the property under the Fifth Amendment. Even if true, however, these facts are

_____

[4] Plaintiffs' argument is nothing more than an attempt to turn the burden of proof on its head. The party claiming preemption bears the burden of showing with specificity that Congress intended to preempt state law. See Silkwood v. Kerr-McGee Corp. , 464 U.S. 238, 255 (1984). Further, plaintiffs misconstrue Blue Circle . That case involved the narrow issue of RCRA preemption and held only that it was indeterminable from the record whether the local legislation was a sham designed to frustrate RCRA policies. The plaintiff in Blue Circle offered three expert witnesses' affidavits attacking the ordinance as unreasonable and irrational and defendant offered nothing in response. Here, there is no evidence the City's open space classification, even if enacted for the worst motive, frustrates any congressional policy with respect to the Association.

-20-

immaterial with respect to the preemption issue.  Had plaintiffs wished to alternatively challenge the zoning classification on grounds it constituted a taking or was arbitrary and capricious, they were free to assert that claim in state court or before the district court.    See Executive 100, Inc. v. Martin County    , 922 F.2d 1536, 1540 (11th Cir. 1991) (denoting causes of action for challenging zoning classification).  Regardless, we will not entertain these arguments which are presented for the first time on appeal.

AFFIRMED.