FILED
United States Court of Appeals
Tenth Circuit

May 14, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

WYRICK G. DEANE,

      Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA,
SECRETARY OF THE
DEPARTMENT OF AGRICULTURE,
and UNITED STATES FOREST
SERVICE,

      Defendants-Appellees,

and

PITKIN COUNTY, BOARD OF
COUNTY COMMISSIONERS,

      Defendant-Appellant.

No. 08-1058

(D.C. No.
1:00-CV-02361-WDM-BNB)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **BALDOCK**, and **O'BRIEN**, Circuit Judges.

Plaintiff Wyrick G. Deane sued the United States under the Quiet Title Act,

28 U.S.C. § 2409a, claiming title to various properties that Pitkin County quit-

claimed to the United States. Deane and the United States reached a proposed

---

[*] This order and judgment is not binding precedent except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however,
for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

settlement, but Pitkin County joined the action and objected, arguing the settlement would violate a Colorado subdivision statute. The district court determined that federal law preempted the Colorado statute on a ground not argued by the parties, and approved the proposed settlement. Pitkin County now appeals that ruling. We have jurisdiction under 28 U.S.C. § 1291. Finding error in the district court's conflict preemption ruling, we reverse and remand for further proceedings.

## I.

A 1994 act of Congress provided for the exchange of a 217-acre parcel of federal property for approximately 1,258 acres of land purportedly owned by Pitkin County. See Pub. L. No. 103-255, 108 Stat. 684 (1994) (Exchange Act). The County lands, which we refer to as the Exchange Act Parcels, included many properties forfeited to the County for nonpayment of taxes. Because many of the Exchange Act Parcels lacked clear title, the legislation provided that the sole legal remedy for any party claiming an interest in the lands was to sue the United States under the Quiet Title Act. See Exchange Act § 5(a). In the event of an adverse quiet-title determination against the United States, the Exchange Act required the County to reimburse the United States for the fair market value of the lands. See Exchange Act § 6(a). Since passage of the Exchange Act, some 51 quiet title suits have been filed against the United States. This litigation, which Deane commenced

2

on November 30, 2000, includes 15 such actions.[1]

Deane claims title to 25 properties comprising approximately 230 acres within the Exchange Act Parcels. By 2007, Deane and the United States (the Settling Parties) agreed to a proposed global settlement. Under the settlement agreement, Deane would quitclaim his interest in the 25 Exchange Act Parcels subject to the quiet title suit, three additional Exchange Act Parcels not subject to the litigation, and 7 other parcels (the Deane Parcels). Combined, these properties include approximately 300 acres. In return, the United States would cross-convey a 2.26 acre parcel (Parcel A), to be carved out of two Exchange Act Parcels, known as the Diamond and Ophir Lodes, and grant Deane access to Parcel A across Forest Service lands.

Parcel A contains an existing cabin, and the cross-conveyance would include restrictive covenants precluding development of the parcel or construction of larger improvements. Specifically, the deed restrictions provide that the Parcel A cabin "shall not be increased from the current cabin size unless repaired or remodeled, in which event the total cabin size shall be limited to no more than 500 square feet." Appellant's Appendix (App.) at 180. Parcel A is located on the western flank of Aspen Mountain, within a quarter mile of the Aspen Mountain Skiing Area. The

---

[1] The district court consolidated the 15 separate suits on February 8, 2007. See Fed. R. Civ. P. 42. Out of the 51 total quiet title suits, 1 was voluntarily dismissed, 4 were settled, 5 were decided in favor of the United States, and 26 were administratively closed—leaving the 15 suits at issue here.

3

underlying county zone district is "Rural and Remote," which requires a minimum parcel area of 35 acres. App. at 174.

In 2006, the Settling Parties asked Pitkin County to approve the settlement. By submitting the settlement agreement for approval to the County, the Settling Parties relied on Colorado Revised Statute § 30-28-101 without conceding its applicability in the present case. Section 30-28-101 provides for county authority over the subdivision of county lands in Colorado. The statute defines "[s]ubdivision" or "subdivided land" to mean "any parcel of land in the state . . . which is divided into two or more parcels." Colo. Rev. Stat. § 30-28-101(10). The statute provides that divisions of land effectuated by court decree are not treated as "subdivisions," unless the judicial decree is pursued "for the purpose of evading" the subdivision statute. See id. § 30-28-101(10)(c)(II).[2]

The County informed the United States that it would not approve the portion

---

[2] The pertinent portion of the statute reads:

(c) Unless the method of disposition is adopted *for the purpose of evading* this part 1, the terms "subdivision" and "subdivided land" . . . shall not apply to any division of land:
***
(II) Which could be created . . . by order of any court in this state if the board of county commissioners of the county in which the property is situated is *given timely notice* of any such pending action by the court and *given opportunity to join as a party in interest* in such proceeding for the purpose of raising the issue of evasion of this part 1 prior to entry of the court order . . . .

Colo. Rev. Stat. § 30-28-101(10)(c)(II) (emphasis added).

4

of the settlement establishing Parcel A and the accompanying cabin. The County also indicated that it might require Deane to raze the cabin if the United States conveyed Parcel A to him. Reacting to the County's threat, the Settling Parties modified language in the restrictive covenants providing that the covenants "shall be deemed void and unenforceable if the cabin is subject to a final order requiring that it be modified or removed." App. at 180. Although the exact grounds on which Pitkin County initially denied approval are not in the record, it contended in the district court that the proposed settlement would (1) illegally create Parcel A, and (2) undermine the County's transferable development rights (TDR) program.[3]

At the request of the Settling Parties, the district court presiding over Deane's quiet title suit issued notice to Pitkin County that it could join as a party "for the sole purpose of raising the issue of whether the proposed global settlement . . . would constitute an unlawful evasion" of the Colorado county planning statute. After Pitkin County filed a motion to join as a party in interest, the district court issued an order joining the County as a necessary party defendant under Rule 19 of the Federal

---

[3] The program allows landowners to sell TDRs from their properties in exchange for cash. The purchaser of a TDR can then utilize it to increase the intensity of development in other areas of Pitkin County. Through the program, Pitkin County asserts that it has already preserved the wilderness character of the seven Deane Parcels not subject to the original quiet title litigation. According to the County, "[i]f the Forest Service begins carving out federal lands—like Parcel A—in the Rural and Remote zone district and transferring them into private ownership[,] the entire purpose of the TDR program will be undermined and the community balance underlying the program will be upset." App. at 174-75.

Rules of Civil Procedure. The district court ordered briefing "addressing the merits of approval of the settlement and whether the order [approving it] is a division of land not required to follow the County subdivision regulations."

Pitkin County requested discovery and an evidentiary hearing regarding whether the Settling Parties sought to evade § 30-28-101. Among other things, Pitkin County requested to explore the history of the area, local land use regulation, and the mental state of the Settling Parties, *i.e.*, whether they intended to use § 30-28-101(c)(II)'s court-ordered bypass provision to evade the requirements of the statute. The Settling Parties opposed holding an evidentiary hearing, contending that federal law preempted application of § 30-28-101. The Settling Parties based their preemption arguments on (1) the power of the United States Department of Agriculture to manage federal lands; see 16 U.S.C. § 551, 7 C.F.R. §§ 2.60(a)(2) & 2.20(a)(2)(ii); and (2) the power of the United States Department of Justice to settle litigation; see 28 C.F.R. § 0.160(a)(3).

The district court rejected all of the arguments for preemption presented by the Settling Parties. First, the district court concluded that the "general vague authority of the Secretary of Agriculture to regulate the occupancy" of federal lands was an insufficient basis to infer conflict preemption. Second, the district court reasoned that the Department of Justice's general authority to settle non-monetary disputes lacked merit because the mere "fact of settlement . . . regardless of whether the acts prescribed by the settlement were authorized by Congress" was not an acceptable

6

rationale to justify preemption, "as such thinking would give license to federal administrators to agree to unauthorized or unlawful acts in settlement of litigation."

Even though the district court rejected all the arguments for preemption offered by the Settling Parties, it nonetheless proceeded to hold that preemption applied on a ground not advanced in briefing or at oral argument. The district court held that the Federal Land Policy Management Act (FLPMA), specifically 43 U.S.C. §§ 1715 & 1716, preempted Pitkin County from exercising its regulatory authority over the disposition of Parcel A. The district court reasoned that "Congress has clearly delegated to the Secretary of Agriculture the power to regulate and control National Forest lands, including the authority to exchange or sell off small parcels, such as Parcel A." The district court concluded that where Congress exercises such power, "federal law necessarily overrides and preempts conflicting state laws or policies." Thus, the exchange could not "be barred or frustrated by state law." The district court held accordingly that "§ 30-28-101 is preempted by the Property and Supremacy Clauses of the United States Constitution." The district court approved the settlement agreement and denied Pitkin County's request for an evidentiary hearing. The Settling Parties subsequently filed a stipulated notice of dismissal of Deane's quiet title claims. Pitkin County made a timely appeal.

## II.

"We review the district court's preemption determination de novo." <u>Mount Olivet Cemetary Ass'n v. Salt Lake City</u>, 164 F.3d 480, 486 (10th Cir. 1998).

7

Because we disagree with the district court's conclusion that § 30-28-101 stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," we reverse and remand for further proceedings. Id.

A.

"Congress' power to preempt state and local law derives from the Supremacy Clause." Id. at 486. Guiding our analysis are the two "cornerstones of . . . pre-emption jurisprudence." Wyeth v. Levine, 129 S.Ct. 1187, 1194 (2009).

> First, the purpose of Congress is the ultimate touchstone in every pre-emption case. Second, in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Id. at 1194-95 (internal quotations, ellipses, alterations, and citations omitted). "The party claiming preemption bears the burden of showing with specificity that Congress intended to preempt state law." Mount Olivet, 164 F.3d at 489 n.4.

There are three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. See id. The district court's reasoning rested on the third category—conflict preemption. The district court relied on two sections of the FLPMA in holding that conflict preemption applied. First, the district court cited § 1715(a), which provides as follows:

> Notwithstanding any other provisions of law, the Secretary [of the Interior], with respect to the public lands and the Secretary of Agriculture, with respect to the acquisition of access over non-Federal lands to units of the National Forest System, are authorized to acquire

8

pursuant to this Act by purchase, exchange, donation, or eminent domain, lands or interests therein.

43 U.S.C. § 1715.

Second, the district court cited § 1716(a), which provides that

[a] tract of public land or interests therein may be disposed of by exchange by the Secretary [of the Interior] under this Act and a tract of land or interests therein within the National Forest System may be disposed of by exchange by the Secretary of Agriculture under applicable law where the Secretary concerned determines that the public interest will be well served by making that exchange.

43 U.S.C. § 1716.

In order for §§ 1715 & 1716 to preempt the Colorado subdivision statute, we must be convinced that "[(1)] compliance with both the federal and state laws is a physical impossibility, or [(2) that] . . . the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Mount Olivet, 164 F.3d at 486.

We can dispense fairly quickly with the first prong: none of the parties contend that the Colorado subdivision statute makes it physically impossible to comply with the FLPMA; neither did the district court reach this conclusion. In the absence of any compelling argument that the Colorado statute prevents compliance with the FLPMA, we proceed to the second prong of conflict preemption.

The district court reasoned that the Colorado subdivision statute stood as an obstacle to Congress's purpose in enacting the FLPMA. We disagree. As Pitkin County observes, the implementing regulations of the FLPMA demonstrate that the

9

federal statute and state zoning laws may operate harmoniously. For example, the 36 C.F.R. § 254.3(h) provides that the "use or development of lands conveyed out of Federal ownership are subject to . . . all laws, regulations, and zoning authorities of State and local governing bodies."[4]

"Land use policy such as zoning customarily has been considered a feature of local government and an area in which the tenets of federalism are particularly strong." Mount Olivet, 164 F.3d at 487. In such circumstances, we are particularly averse to find preemption. See Ramsey Winch Inc. v. Henry, 555 F.3d 1199, 1204 (10th Cir. 2009) (holding that the presumption against preemption "applies with greater force when the alleged conflict is in an area traditionally occupied by the States"). Indeed, it appears to us that the Settling Parties do not attempt to avoid a *conflict* with state law, but rather seek the *benefit* of a loophole in the Colorado statue for court-ordered creation of subdivisions. See § 30-28-101(10)(c)(II) (providing that the terms "subdivision" and "subdivided land" do not apply to any division of land "created . . . by order of any court in this state"). Ultimately, the

---

[4] The County also observes that the United States may not have complied with regulations requiring certain procedural steps to be taken before consummating a land exchange under §§ 1715 & 1716. See 36 C.F.R. § 254.8 (requiring notice of the exchange to the public, the applicable congressional delegation, and local officials, and mandating public opportunity to comment on the proposed exchange); id. § 254.3(g) (requiring analysis of the proposed exchange under the National Environmental Policy Act); id. § 254.13(b) (providing a right of appeal). The County rightly observes, however, that any action under the Administrative Procedure Act to remedy a violation of these regulations is not ripe at this time.

district court may determine that the benefits of the subdivision statute should be applied to the Settling Parties after considering the merits. But we cannot see, under these facts, that a state zoning statute designed to regulate "subdivisions" in any way "materially impede[s]," Ramsey Winch, 555 F.3d at 1204, the powers Congress intended to confer in the FLPMA—particularly when the implementing regulations specifically provide that state zoning laws are to be respected. See 36 C.F.R. § 254.3(h).

## B.

Perhaps recognizing that conflict preemption is a shaky foundation on which to defend the district court's holding, the United States (but not Deane) has abandoned the argument on appeal. Instead, the United States urges that the Colorado subdivision statute cannot apply by virtue of the intergovernmental immunity doctrine first enunciated in McCulloch v. Maryland, 17 U.S. 316 (1819). Whatever the merits of this contention, it was not presented to the district court. We have discretion regarding whether or not to reach this argument on appeal. See Singleton v. Wulff, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."). In this case, we decline to consider the United States' intergovernmental immunity argument without the benefit of the district court's prior consideration of the matter.

11

## C.

Having determined that the Colorado subdivision statute is not preempted by the FLPMA, we conclude that the basis for the district court's approval of the proposed settlement is error. Accordingly, we REVERSE the district court's conflict preemption holding, VACATE its approval of the proposed settlement, and REMAND for further proceedings.

On remand, the district court might reach the arguments on the merits that Deane advanced on appeal—which we do not address—such as the potential application of the doctrine of non-conforming use. Likewise, it might follow the procedure outlined in § 30-28-101 for resolving Pitkin County's objections through an evidentiary hearing and appropriate findings. Similarly, the district court might proceed to weigh the merit of the United States' intergovernmental immunity contentions. Finally, the district court might ultimately approve or disapprove the proposed settlement on some other ground. Our listing of potential avenues for the district court to consider should not be interpreted as foreclosing any proper ground for disposition on remand.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge

12

08-1058, *Deane v. United States, et. al.*

**O'BRIEN**, J., dissenting.

I agree with the majority's resolution of the preclusion arguments but see no need for the district court to consider the intergovernmental immunity argument, raised for the first time on appeal. This dispute is between Deane and Pitkin County. I would reverse with instructions to dismiss, leaving issues of Colorado law involving only Colorado citizens and entities to be resolved by a Colorado court. For that reason, I respectfully dissent.

The settlement reached in this quiet title action appears to be a good one. Disputed title to federal lands is resolved, the United States has consolidated its forest holdings in an area near Aspen, Colorado, where development pressure is intense, and potential land uses contrary to forest management goals have been largely eliminated. And the settlement was obtained at modest cost. Deane will have an access easement across forest lands and clear title to a small (2.24 acre) tract of land containing a cabin, which is permanently restricted to no more than 500 square feet. A nonconforming use in the forest near Aspen may be tolerable. In the face of all the good things wrought by the settlement, why does Pitkin County want to be a fly in the ointment? That is not entirely clear, but it claims the deal frustrates its master land use plan, interferes with its well-designed program of transferrable development rights, and violates state law. But the violations, if they exist, seem piddling when compared to all the advantages the settlement offers. The United

States and Deane are frustrated. That frustration seems to have been vented in this aspect of the quiet title action, cooked up to preempt Pitkin County from later taking action against Deane, which might depreciate his enjoyment of the settlement. If Pitkin County is correct in its assessment of Colorado law and is willing to press the issue to extreme limits it might be able to require Deane to remove the cabin once the settlement is complete and deeds are exchanged.

But Pitkin County did not seek to intervene in the quiet title suit. It has made no attempt to prevent the settlement and exchange of deeds. It was asked its position with respect to the settlement and answered honestly. Because its answer was unsatisfactory to Deane, it was "invited" (under the threat of a preclusive order foreclosing its rights) to participate in the quiet title suit "for the sole purpose of raising the issue of whether the proposed global settlement of the parties and the real property transfers described therein would constitute an unlawful evasion of [COLO. REV. STAT. ANN. § 30-28-101]." (Appellant's App. at 76.) Not wanting to be finessed out of its governmental prerogatives Pitkin County petitioned to be heard and attempted to litigate the nominal issue — whether Deane, abetted by the United States, was attempting to evade state law and local subdivision regulations. But as soon as Pitkin County joined the scrum the game plan changed. The federal government introduced a new argument — federal law precluded any subsequent enforcement of state subdivision statutes by Pitkin County to the extent such enforcement might render Deane's bargain with the United States less desirable.

2

At bottom the federal government's position (whether based on preclusion or its newly minted theory of intergovernmental immunity) is simply this — to promote an expeditious resolution of its settlement with Deane the United States can drape the mantle of sovereign immunity over Deane's shoulders, preventing the fulsome application of Colorado law, whatever that might be. The federal government is not willing to await, let alone abide, a determination of Colorado law as it relates to Deane. Doing so might make this whole exercise moot.

The Attorney General has authority to settle litigation on terms advantageous to the United States and court oversight of his decisions is circumscribed, but not absent. *See* 28 U.S.C. §§ 516, 519 (providing plenary power to the Attorney General to settle litigation to which the federal government is a party); *but cf. United States v. Carpenter*, 526 F.3d 1237, 1242 (9th Cir. 2008) ("[w]e think it alien to our concept of law to allow the chief legal officer of the country to violate its laws under the cover of settling litigation."), *cert. denied*, 129 S. Ct. 1612 (2009); *Executive Bus. Media, Inc. v. United States Dep't of Defense*, 3 F.3d 759, 762 (4th Cir. 1993) ("The Attorney General's authority to settle litigation for its government clients stops at the walls of illegality.").

Pitkin County attempted to raise several arguments in the district court as to why the transfer was at least procedurally contrary to law. It was rebuffed by the federal government's argument that the deal was not yet final and, since agency action had not been exhausted, Pitkin County could not be heard on those arguments.

3

More about that later. More to the point is this; the Attorney General's excuse for attempting to preclude Pitkin County from exercising its governmental prerogatives is illusory.

Deane and the United States do not need the imprimatur of the district court to settle the pending quiet title action. An exchange of quit claim deeds and stipulation for dismissal is not something with which the district court must, or even should, be concerned. Sometimes there is a need for federal courts to superintend enforcement of continuing obligations (not present here). Sometimes federal courts must decide if a settlement is in the public's best interest (not so here). Sometimes a federal court must deal with opponents of a settlement who seek to intervene in order to block or modify it (also not present here). *Cf. San Juan County, Utah v. United States*, 503 F.3d 1163, 1189 (10th Cir. 2007) (en banc) (noting "It has never been supposed that one party — whether an original party, a party that was joined later, or an intervenor — could preclude other parties from settling their own disputes and thereby withdrawing from litigation.") (quoting *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 528-29 (1986)).

Here the settling parties offer only the slimmest of reasons for judicial superintendence. They claim Pitkin County's threats to enforce Colorado law will queer their deal and they need the assistance of the federal courts to thwart Pitkin County's nefarious intentions.

4

But Pitkin County fully recognizes the supremacy of the federal government and it claims no right to interfere with the federal government's transfer of this tract of land to Deane. It claims the right to regulate the use of the 2.24 acre tract according to state law only after it is transferred to Deane and only against Deane.

At oral argument Deane's sole position was that he would win on the merits. Moreover and importantly, in the written settlement agreement with the United States Deane assumes the risk of Pitkin County's future actions. "Deane further stipulates and agrees that Deane and his successors and/or assigns accept fully and entirely the risk, if any, that the existing cabin on PARCEL A may be subject to a final order requiring modification or removal . . . and Deane, on behalf of himself and his successors and/or assigns, hereby forever releases the United States from any and all liability or claims related to such risk or final order." (Appellant's App. at 40.) The agreement makes manifest what Pitkin County has been arguing — its quarrel is with Deane, not the United States, and the supremacy of federal interests is not at stake.

After Pitkin County was pressed into joining the fray the federal government argued the County was preempted by federal law from even attempting to enforce Colorado law against Deane. It claimed if the County was permitted to do so it would interfere with, possibly queer, its settlement. The federal government based its settlement authority on federal statutes. In response Pitkin County attempted to show the federal government did not comply with the requirements of the very statutes upon which it relied. The federal government objected to Pitkin County's

5

arguments, saying its objections were premature because the deal was not yet signed and agency action had not been exhausted.  Good enough!

But at oral argument the panel questioned the jurisdiction of federal courts to consider these issues if the deal was not final.  In response counsel for the federal government said the deal was done in substance; it had been reduced to writing and would be signed as soon as the district court approved  — thus federal courts have jurisdiction.  But when pressed about the terms of the agreement counsel said the written agreement did not represent the <u>full measure</u> of the settling parties' agreement because Deane would back out unless (contrary to the terms of the written agreement) he had enforceable assurances that his cabin was safe from Pitkin County's regulatory ambition.  The malleable nature of the sometimes on, sometimes off written agreement and the parties conduct in general prompts three observations: First, duplicity reigns.  Second, this dispute is  between Deane and Pitkin County; the federal government's complicity with Deane is just an expedient, but unprincipled, way of ending a title dispute that has been pending since 2000.  Third, there are knotty jurisdictional problems that can be easily avoided by dismissal, leaving the true contending parties to state remedies.

At oral argument counsel for the federal government said the district court, in effect, treated this matter as a declaratory judgment action (the court did not say so).  If this is, in fact, a declaratory judgment action properly cognizable in federal court it should have been so pled, giving Pitkin County an opportunity to be heard on the

issues, particularly as to whether a declaratory judgment action should proceed in federal court as an adjunct to a quiet title action between other parties. The parties have not suggested a state declaratory judgment action would not lie.

I would reverse and instruct the district court to dismiss, or at least abate, these proceedings to permit a Colorado court to decide the issues of Colorado law.