**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 11 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

NATIONAL LABOR RELATIONS
BOARD,

      Plaintiff-Appellant,

and

LOCAL UNION NO. 1385,
WESTERN COUNCIL OF
INDUSTRIAL WORKERS,

      Intervenor-Appellant,

v.

PUEBLO OF SAN JUAN,

      Defendant-Appellee.

---

NATIONAL RIGHT TO WORK
LEGAL DEFENSE FOUNDATION,

      Amicus Curiae.

No. 99-2011
No. 99-2030

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CIV-98-35-MV/RLP)

---

ON REHEARING EN BANC

Nancy E. Kessler Platt, Supervisory Attorney, (Leonard R. Page, Acting General Counsel, John H. Ferguson, Associate General Counsel, Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Margery E. Lieber, Assistant General Counsel, and Eric G. Moskowitz, Deputy Assistant General Counsel, with her on the brief) of the National Labor Relations Board, Washington, D.C., for Plaintiff-Appellant.

Lee Bergen (Wayne H. Bladh, Daniel I.S.J. Rey-Bear, Thomas J. Peckham, with him on the brief) of Nordhaus, Haltom, Taylor, Taradash & Bladh, Albuquerque, New Mexico for Defendant-Appellee.

Harlan Bernstein of Jolles & Bernstein, PC, Portland, Oregon, Matthew E. Ortiz of Catron, Catron & Sawtell, PA, Santa Fe, New Mexico, Michael T. Garone of Jolles, Bernstein & Garone, Portland, Oregon, and Morton S. Simon of Simon, Oppenheimer & Ortiz, Santa Fe, New Mexico, on the briefs for Intervenor-Appellant.

Mickey D. Barnett, Law Offices of Mickey D. Barnett, P.A., Albuquerque, New Mexico and John C. Scully, Springfield, Virginia, filed an amicus curiae brief for the National Right to Work Foundation.

---

Before **TACHA**, Chief Judge, **HOLLOWAY,** Senior Circuit Judge, **SEYMOUR**, Circuit Judge, **BRORBY,** Senior Circuit Judge, and **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, and **MURPHY**, Circuit Judges. Judge **BRISCOE** is filing a concurring opinion. Judge **LUCERO** is filing a concurring opinion by which he joins Parts I, II and IV of the majority opinion. Judge **MURPHY** dissents.

---

**HOLLOWAY,** Senior Circuit Judge.

---

In 1996 the San Juan Pueblo tribal council enacted a right-to-work ordinance and also adopted a lease containing similar right-to-work provisions. These actions were challenged by the instant declaratory judgment and injunction suit brought by the National Labor Relations Board (NLRB or the Board) and Local Union No. 1385 of the Western Council of Industrial Workers (the Union) as an intervenor. After

rejection of this suit by the district court, the Board and the intervening Union brought this appeal from the district court's decision granting summary judgment in favor of the Pueblo.

I

The relevant facts are undisputed. San Juan Pueblo is a federally-recognized Indian tribe located in New Mexico. Most of its 5,200 members live on tribal lands that are held in trust by the United States for the Pueblo. The Pueblo is governed by a tribal council, which is vested with legislative authority over tribal lands. Through federally-approved leases, the Pueblo leases certain portions of its tribal land to non-tribal businesses as a source of generating tribal income and as a means of employment for tribal members. The origins of this case lie in a labor dispute involving a lumber company operating on leased lands since August, 1996. The history of the leases as well as the dispute, which has now been settled, is described in the District Court's opinion. *NLRB v. Pueblo of San Juan*, 30 F. Supp. 2d 1348, 1350–51 (1998).

On November 6, 1996, the San Juan Pueblo Tribal Council enacted Tribal Ordinance No. 96-63 which it amended on February 4, 1998. The ordinance in substance is a so-called "right-to-work" measure. The Pueblo asserts that the ordinance is a valid exercise of its inherent sovereign authority. *Id.* at 1351. As amended, the ordinance prohibits the making of agreements containing union-

security clauses covering any employees, whether tribal members or not. Section 6(a) of the ordinance reads:

> No person shall be required, as a condition of employment or continuation of employment on Pueblo lands, to: (i) resign or refrain from voluntary membership in, voluntary affiliation with, or voluntary financial support of a labor organization; (ii) become or remain a member of a labor organization; (iii) pay dues, fees, assessments or other charges of any kind or amount to a labor organization; (iv) pay to any charity or other third party, in lieu of such payments any amount equivalent to or a pro-rata portion of dues, fees, assessments or other charges regularly required of members of a labor organization; or (v) be recommended, approved, referred or cleared through a labor organization.

Supplemental Brief on Rehearing en Banc (NLRB) at 4. The ordinance prohibits employers and unions from entering into agreements requiring employees to maintain membership in or pay dues to a union, called union security agreements. The Pueblo's lease with the lumber company similarly provides:

> Lessee will not enter into any contract or other arrangement which would require a Tribal member to be a member of a union, league, guild, club, or association (hereinafter collectively referred to as "union") in order to be entitled to all of the priorities to be accorded him pursuant to this Property Lease. Tribal members will not be required to join or maintain membership in, or pay any dues or assessments to, any union in order to be hired and benefit from the priorities stated in this Lease.

Brief on Appeal for the NLRB, at 5. The "priorities" mentioned in the lease refer to terms of employment for employees who are tribal members. *Id.* at 5 n.3.

On January 12, 1998, the NLRB filed the instant suit in the United States

4

District Court for the District of New Mexico by its Complaint for Preliminary and Permanent Injunction and for a Declaratory Judgment, alleging that the ordinance and lease provisions, insofar as they prohibit compliance with union-security agreements, are preempted by federal law. Specifically, the Board argued that these provisions are invalid under the Supremacy Clause of the United States Constitution, art. VI, cl. 2,[1] due to preemption by the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.* (hereinafter the NLRA). Leave to intervene was granted to the Union upon the parties' stipulation.

The district court issued a Memorandum Opinion and Order on November 30, 1998, granting the Pueblo's motion for summary judgment and denying such motions of the NLRB and the Union. *NLRB v. Pueblo of San Juan*, 30 F. Supp. 2d 1348. On appeal, a divided panel affirmed the district court's decision. We granted petitions of the NLRB and the Union for rehearing *en banc* which we have held. We now affirm the district court's decision.

---

[1]"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the Contrary notwithstanding." United States Constitution, art. VI, cl. 2.

II

A

<u>The Pueblo's sovereign authority to regulate labor
relations and inherent limitations on that authority</u>

The central question before us is whether, in light of the United States
Constitution's Supremacy Clause, and Congress' plenary power over Indian affairs,[2]
the NLRA prevents the Pueblo from enacting a "right-to-work law" or entering into
a lease with provisions making prohibitions similar to those in right-to-work laws.[3]
We believe the question of the validity of the lease provisions here is subsumed
within the larger question of the validity of the ordinance. Because this is a question
of law, we review the district court's order de novo. *Mt. Olivet Cemetery Ass'n v.*

---

[2]Congress' power over Indian matters derives from the Constitution's Indian
Commerce Clause, in art. I, § 8, cl. 3, and its treaty power, art. II, § 2, cl. 2.
*McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 172 n.7 (1973).

[3]A "right-to-work" law, as the term is used here, is a statute which § 14 (b) of
the NLRA permits states and territories to enact to invalidate agreements
establishing "union shops." A closed shop, originally permitted under the NLRA,
is created when an employer and a union agree that only people who are already
union members may be hired. This was outlawed in 1947 by the Taft-Hartley
Act's amendment of the NLRA, 29 U.S.C. § 158 (a) (3). A union shop is created
when an employer and a union agree to require employees, as a condition of their
continued employment, to have membership in a labor union "on or after the
thirtieth day following the beginning of such employment." 29 U.S.C. § 158 (a)
(3). Such an agreement between an employer and a union is a union security
agreement. Provided they comply with other requirements of 29 U.S.C. § 158,
and provided no right-to-work law forbids them, the NLRA permits union shops
and union security agreements.

6

*Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998). The burden falls on the NLRB and the Union, as plaintiffs attacking the exercise of sovereign tribal power, "to show that it has been modified, conditioned or divested by Congressional action." *Southland Royalty Co. v. Navajo Tribe*, 715 F.2d 486, 488 (10th Cir. 1983). As noted in *Southland Royalty,* "'[a]mbiguities in federal law have been construed generously in order to comport with . . . tribal notions of sovereignty and with the federal policy of encouraging tribal independence.'" *Id.* at 490.

In their challenges to the district court's decision and our panel's ruling, the NLRB and the Union argue that § 8 (a) (3) of the National Labor Relations Act, 29 U.S.C. § 158 (a) (3), clearly protects the rights of a union and an employer to enter into union security agreements meeting the requirements of § 8 (a) (3). Moreover the NLRB and the Union maintain that Congress intended by the force of the Wagner and Taft-Hartley Acts to preempt state and local regulation of union security clauses with the narrow exception of § 14 (b), 29 U.S.C. §164 (b), allowing only states or territories to prohibit otherwise permitted union shop provisions. Appellant's Opening Brief at 9-10. We disagree and instead are convinced by the Pueblo's argument that, as an Indian tribe, it retains the sovereign power to enact its right-to-work ordinance, and to enter into the lease agreement with right-to-work provisions, because Congress has not made a clear retrenchment of such tribal power as is required to do so validly.

7

We begin by noting what the district court also took pains to point out, namely, that the general applicability of federal labor law is not at issue. *NLRB v. San Juan Pueblo*, 30 F. Supp 2d at 1351. Furthermore, the Pueblo does not challenge the supremacy of federal law. The ordinance, as amended, does not attempt to nullify the NLRA or any other provision of federal law. The suggestion that tribes, including those that have already enacted right-to-work laws,[4] might "enact ordinances allowing precisely what generally applicable federal law prohibits"[5] finds no support in this record. Furthermore, there is no danger that the Pueblo and the State of New Mexico might enact conflicting laws, since state right-to-work laws are of no effect in federal enclaves such as Indian reservations, *see Lord v. Local Union No. 2088, IBEW*, 646 F.2d 1057, 1062 (5th Cir. 1981) (finding state right-to-work law inapplicable in federal enclave in spite of § 14 (b) of the NLRA), *cert. denied*, 458 U.S. 1106 (1982); *New Mexico Fed'n of Labor v. City of Clovis*, 735 F. Supp. 999, 1002-03 (D.N.M. 1990) (indirectly noting the inapplicability of state right-to-work laws in federal enclaves).

Rather, the central question here is whether the Pueblo continues to exercise the same authority to enact right-to-work laws as do states and territories, or whether

---

[4]These include the Navajo Nation, the Crow Tribe, and the Osage Tribe. *Amicus Curiae* brief of the National Right to Work Foundation in Support of Appellee Pueblo of San Juan at 17.

[5]NLRB brief at 12.

Congress in enacting §§ 8 (a) (3) and 14 (b) of the NLRA, 29 U.S.C. §§ 158 (a) (3) and 164 (b), intended to strip Indian tribal governments of this authority as a sovereign. Pursuant to the Supremacy Clause, the federal government has the power to preempt state and municipal authority in a particular field. *Wardair Canada, Inc. v. Florida Dept. of Revenue*, 477 U.S. 1 (1986). Likewise, Congress in the exercise of its plenary power over Indian affairs may divest Indian tribes of their inherent sovereign authority, *United States v. Wheeler*, 435 U.S. 313, 323 (1978), a point the Pueblo does not dispute.

Indian tribes are not states for constitutional purposes, and the preemption analysis is not exactly the same. *See Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 181 (2d Cir. 1996) ("[T]ribes are not states under OSHA . . . and thus, OSHA does not preempt tribal safety regulations in the same manner in which it preempts state laws."). We need not delineate precisely the scope of federal preemption of tribal laws here, however. A well-established canon of Indian law states that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985). The Supreme Court has also explained that this canon means that "doubtful expressions of legislative intent must be resolved in favor of the Indians." *South Carolina v. Catawba Tribe of Indians*, 476 U.S. 498, 506 (1986). The canon applies to other statutes, even where they do not mention Indians at all. *EEOC v.*

9

*Cherokee Nation*, 871 F.2d 937, 939 (10th Cir. 1989) (construing the Age Discrimination in Employment Act).

In resolving questions of preemption of state law, the test is one of congressional intent. *Wardair Canada*, 477 U.S. at 6. In order to find preemption of tribal laws, similarly it is necessary to determine whether Congress intended to divest the San Juan Pueblo of its power as a sovereign to pass right-to-work laws. The burden to show such congressional intent to divest the Pueblo of its power to enact its right-to-work ordinance and to enter into the lease agreement rests upon the Union and the NLRB. *See EEOC v. Cherokee Nation*, 871 F.2d 937, 939 (10th Cir. 1989) (requiring party arguing preemption to carry burden of presenting clear evidence of Congressional intent); *Southland Royalty Co. v. Navajo Tribe*, 715 F.2d 486, 488 (10th Cir. 1983) (tribe's general authority as sovereign included power to tax and the burden on those attacking that power was to show that it had been modified, conditioned or divested by Congressional action). We find no showing here that satisfies the burden of the Board and the Union to demonstrate congressional intent to preempt the Pueblo's authority to enact the ordinance and enter into the lease agreement. In sum, from §§ 8 (3) and 14 (b) of the NLRA as they now stand, we find that the Board and the Union are reduced to arguing that there is *implied* preemption of tribal sovereign authority to enact a right-to-work ordinance or to enter into the challenged lease agreement. However implied

10

preemption of such sovereign authority does not suffice. *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987) (" . . . [T]he proper inference from silence . . . is that the sovereign power . . . remains intact.").

Indian tribes are neither states, nor part of the federal government, nor subdivisions of either.[6] Rather, they are sovereign political entities possessed of sovereign authority not derived from the United States, which they predate. *See McClanahan*, 411 U.S. at 172 ("the . . . Indian [tribes'] . . . claim to sovereignty long predates that of our own Government."). The Pueblo, like all Indian tribes, need not rely on a federal delegation of powers. "Indian tribes consistently have been recognized . . . by the United States, as 'distinct, independent political communities' qualified to exercise powers of self-government, not by virtue of any delegation of powers, but rather by reason of their original tribal sovereignty." Felix Cohen, *Handbook of Federal Indian Law* 232 (1982) (footnotes omitted) (citing *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832)). Tribes retain those attributes of inherent sovereignty not withdrawn either expressly or necessarily as a result of their

---

[6]As we have previously explained,

> Indian tribes are not states. They have a status higher than that of states. They are subordinate and dependent nations possessed of all powers [except] to the extent that they have expressly been required to surrender them by the superior sovereign, the United States.

*Native Am. Church of N. Am. v. Navajo Tribal Council*, 272 F.2d 131, 134 (10th Cir. 1959).

11

status. *United States v. Wheeler*, 435 U.S. 313, 323 (1978). "[U]ntil Congress acts, the tribes retain their existing sovereign powers." *Id.* We are persuaded that those powers include the authority to adopt the ordinance challenged here by the NLRB and the Union and to enter the lease agreement.

In addition to broad authority over intramural matters such as membership, tribes retain sovereign authority to regulate economic activity within their own territory, *see, e.g., Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137 (1982) (recognizing "the tribe's general authority, as sovereign, to control economic activity within its jurisdiction . . . ."); *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152-53 (1980) (observing that tribes possess broad civil jurisdiction over the activities of nonmembers on reservation land in which the tribes have a significant interest, and that there was no evidence that Congress had departed from that view). *But see Atkinson Trading Co., Inc. v. Shirley,* 532 U.S. 645 (2001) (holding that tribal interest in tourism activity by nonmember hotel guests on non-Indian owned land within the reservation was inadequate to support the tribal power to tax).

However, courts have described the tribes' status as necessarily resulting in the loss of their power to "engage in foreign relations, alienate their lands to non-Indians without federal consent, or prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights." *Colville*, 447 U.S. at 153-54

12

(citations omitted). Courts have likewise found divestiture of tribal power to tax or regulate certain activities by non-Indians where such activities do not directly affect tribal political integrity, economic security, health, or welfare. *See, e.g., Atkinson Trading Co.,* 532 U.S. 645 (2001) (imposition of hotel occupancy tax on non-Indian guests of non-Indian owned hotel on non-Indian land served by federal and state highways on a reservation)*; Strate v. A-1 Contractors*, 520 U.S. 438 (1997) (civil jurisdiction over a case arising from an accident between nonmembers on a state right-of-way on a reservation); *Rice v. Rehner,* 463 U.S. 713, 736 (1983) (liquor sales on a reservation, where the federal government and states had long exercised concurrent regulatory authority over such trade); *Montana v. United States*, 450 U.S. 544 (1981) (non-Indian fishing and hunting on non-Indian land on a reservation).

In general the cases where, absent congressional guidance, tribes have been found to lack regulatory authority have been those involving nonmembers' activity on non-Indian-owned fee land that was found to have no direct effect on the tribe. "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements," and may also "exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana v.*

13

*United States,* 450 U.S. at 565-66. *See also* William Canby, *American Indian Law* 275-76 (1998) (summarizing recent federal precedents regarding limitations on tribal regulatory jurisdiction). These limiting precedents, however, are not applicable here, where the NLRB seeks a declaratory judgment prohibiting the application of the ordinance to all persons everywhere on the reservation, and where the only instance of regulation cited pertains to consensual commercial dealings between the Pueblo and its members on the one hand, and a lumber company operating on lands leased from the tribe on the other.

B

<u>Whether a valid divestiture has been made of the Pueblo's sovereign authority to regulate labor relations by enactment of the right-to-work ordinance or adoption of the lease containing right-to-work provisions</u>

The retained sovereign authority of Indian tribes is subject to divestiture by Congress. Divestiture may occur by treaty or statute, *United States v. Wheeler*, 435 U.S. 313, 323 (1978), the latter being relied on by the Board and the Union here. Divestiture may also occur necessarily as a result of tribal status, *id.*, or where it is "inconsistent with overriding national interests." *Merrion*, 455 U.S. at 148 n.13. However, divestiture is disfavored as a matter of national policy, *EEOC*, 871 F.2d at 939, and will only be found where Congress has manifested its clear and unambiguous intent to restrict tribal sovereign authority. We have explained that

[w]e believe that unequivocal Supreme Court precedent dictates that *in*

14

> *cases where ambiguity exists* (such as that posed by the ADEA's silence with respect to Indians)*, . . . and there is no clear indication of congressional intent to abrogate Indian sovereignty rights* (as manifested, e.g., by the legislative history, or the existence of a comprehensive statutory plan)*, the court is to apply the special canons of construction to the benefit of Indian interests.*

*Id.* (emphasis added).

Indian interests, as the Supreme Court has interpreted them, include tribal sovereignty, *see White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-44 (1980) (looking to "traditional notions of sovereignty and with the federal policy of encouraging tribal independence" for guidance in interpreting ambiguous or vague federal enactments), and maintaining tribal authority over civil matters on tribal territory, *see, e.g., Williams v. Lee*, 358 U.S. 217, 223 (1959) (upholding a tribe's authority over a business transaction involving a non-Indian on a reservation, and pointing out that "[t]he cases in this Court have consistently guarded the authority of Indian governments over their reservations"). Doubtful or ambiguous expressions, therefore, are to be construed as leaving tribal sovereignty undisturbed.

The Government has assumed trust responsibility for Indians and tribes, including the pueblos. *United States v. Sandoval*, 231 U.S. 28 (1913). The canons of construction favoring Indians reflect this. *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985) ("The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the

15

Indians."). Rules of statutory construction generally "provide for a broad construction when the issue is whether Indian rights are reserved or established, and for a narrow construction when Indian rights are to be abrogated or limited." Cohen at 225. *See, e.g., Santa Clara Pueblo v. Martinez* 436 U.S. 49 (1978) (construing Indian Civil Rights Act narrowly so as to avoid limiting tribal sovereignty); *Bryan v. Itasca County,* 426 U.S. 373 (1976) (upholding right of Indians to be free of state taxation in spite of provisions of Public Law 280). We further note that the canon requiring resolution of ambiguities in favor of Indians is to be given the "broadest possible scope," remembering that "[a] canon of construction is not a license to disregard clear expressions of . . . congressional intent." *DeCoteau v. Dist. County Court*, 420 U.S. 425, 447 (1975).

Where tribal sovereignty is at stake, the Supreme Court has cautioned that "we tread lightly in the absence of clear indications of legislative intent." *Santa Clara Pueblo*, 436 U.S. at 60. The Court's teachings also require us to consider tribal sovereignty as a "'backdrop,' against which vague or ambiguous federal enactments must always be measured," and to construe "[a]mbiguities in federal law . . . generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *White Mountain Apache*, 448 U.S. at 143-44. Courts are consistently guided by the "purpose of making federal law bear as lightly on Indian tribal prerogatives as the leeways of statutory

16

interpretation allow." *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 496 (7th Cir. 1993). We therefore do not lightly construe federal laws as working a divestment of tribal sovereignty and will do so only where Congress has made its intent clear that we do so.

Statutes are entitled to the presumption of non-preemption. *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This is especially true in the context of Indian tribal law. As noted, it is well established that federal statutes are to be construed liberally in favor of Indians and tribes, and that any ambiguities or doubtful expressions of legislative intent are to be resolved in their favor. *Montana v. Blackfeet*, 471 U.S. at 766; *South Carolina v. Catawba*, 476 U.S. at 506. Indian tribes, like states, are entitled to comity. *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d at 496. Furthermore, both the legislative and executive branches have declared that federal Indian policy favors tribal self-government. On this point the Supreme Court has spoken clearly and emphatically: "We have repeatedly recognized the Federal Government's longstanding policy of encouraging tribal self-government . . . . This policy reflects the fact that Indian tribes retain attributes of sovereignty over both their members and their territory, to the extent that sovereignty has not been withdrawn by federal statute or treaty." *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987) (internal quotation and citations omitted). *See also generally,* President's Message to Congress, The American Indians, 116

17

Cong.Rec. 23131 (July 8, 1970) (declaring previous termination policy a failure and announcing a new direction in Indian policy, favoring increased tribal autonomy).[7]

The Court has recognized that reservation tribes enjoy the right to "make their own laws and be ruled by them," as a benefit to be protected from state infringement. *Williams*, 358 U.S. at 220. Preempting tribal laws divests tribes of their retained sovereign authority, running counter to this policy and not benefitting Indians. *See Washington v. Confederated Bands & Tribes of the Yakima Indian Nation,* 439 U.S. 463, 484 (1979) (stating the "general rule that ambiguities in legislation affecting retained tribal sovereignty are to be construed in favor of the Indians," i.e., in favor of tribal sovereignty). In the absence of clear evidence of congressional intent, therefore, federal law will not be read as stripping tribes of their retained sovereign authority to pass right-to-work laws and be governed by them.

We turn now to the arguments made by the Board and the Union that Congress has divested the Pueblo of its sovereign authority to enact the right-to-work ordinance and enter into the lease. All parties agree that neither the legislative history of the NLRA, nor its language, make any mention of Indian tribes. We must decide what is the proper inference to draw from this silence. The NLRB cites *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980): "Where Congress

---

[7]This address by President Nixon has been identified as having "clearly set the current direction of federal policy." William Canby, *American Indian Law* 30 (1998) (citing Cong.Rec. 23258).

18

explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." The Board argues that this rule, akin to the well-known principle *expressio unius est exclusio alterius*, is a "settled principle of statutory construction" which is applicable in this case. Supp. Brief of the NLRB at 16. While this "settled principle" may find application in other types of cases, in matters of Indian law "*expressio unius . . .* " must often be set aside. *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 487 (1999).

The Board argues that, while "'legal ambiguities' can sometimes be 'resolved to the benefit of the Indians,' *DeCoteau v. District County Court*, 420 U.S. 425, 447 (1975), courts cannot ignore a statute's *plain* language . . . ." Supp. Brief at 17. We disagree, however, with the implied contention that silence establishes this statute's plain intent to preempt tribal authority. Silence as to tribes can constitute a latent or intrinsic ambiguity that only becomes apparent when other facts are considered. *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d at 493-94. In the context of Indian law, appeals to "plain language" or "plain meaning" must give way to canons of statutory construction peculiar to Indian law. *Id.* at 493 (finding that the "plain meaning" canon was parried by the canon "that not only treaties but (other) statutes as well are to be construed so far as is reasonable to do in favor of Indians."). We note further that it is congressional intent, and not merely the naked

19

words of a statute, that controls. *South Carolina v. Catawba*, 476 U.S. at 507 n. 16. Silence is not sufficient to establish congressional intent to strip Indian tribes of their retained inherent authority to govern their own territory. *See Kerr-McGee Corp. v. Farley*, 915 F. Supp. 273, 277 (D.N.M.1995), *aff'd* 115 F.3d 1498 (10th Cir. 1997), *cert. denied*, 522 U.S. 1090 (1998) (observing that congressional silence is to be interpreted in favor of Indians).

The correct presumption is that silence does not work a divestiture of tribal power. *Merrion*, 450 U.S. at 148 n.14 ("[T]he proper inference from silence . . . is that the sovereign power to tax remains intact."); *El Paso Natural Gas*, 526 U.S. 473 at 487 (concluding that tribes should be treated like states because the Price-Anderson Act's silence as to tribes was probably attributable to congressional inadvertence). *But see Chickasaw Nation v. United States*, No. 00-507, 2001 WL 1488017 (U.S.) (Nov. 27, 2001) (affirming this circuit's denial of a tax exemption for tribes on their gaming operations, and reaching this conclusion on the basis of the special canon disfavoring implied tax exemptions, evidence of congressional intent, and strong statutory language); *Confederated Tribes of the Warm Springs Reservation v. Kurtz*, 691 F.2d 878 (9th Cir. 1982) (concluding that express tax exemptions for states, their political subdivisions, and the District of Columbia did not provide the clear statutory guidance required to find a tax exemption for a tribe), *cert. denied*, 460 U.S. 1040 (1983). In neither of these latter cases, however, was a

tribe's sovereign authority to enact and enforce laws at stake, as is the case here.

The NLRB points out that, "at the time that [§ 14 (b)] was enacted, Congress was aware that there existed some twelve States with laws prohibiting union security . . . ."[8] Supp. Brief (NLRB) at 12. The Board goes on to argue that "the legislative history indicates that it was these State laws which Congress intended to preserve," and that "[t]he legislative history repeatedly refers to State laws and only State laws prohibiting union security . . . ." *Id.* However, we are not convinced that Congress did not merely intend to preserve the existing state laws, since in including § 14 (b) it recognized the authority of *all* states - and territories as well - to enact their own right-to-work laws if they wished, not just the twelve states that had already done so. The NLRA embraces the possibility that many of the states might be governed by right-to-work laws enacted by sovereign governments. Furthermore, the Act embraces diversity of legal regimes respecting union security agreements at the level of "major policy-making units." *New Mexico Fed'n of Labor*, 735 F. Supp. at 1003.

*Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Bd.*, 336 U.S. 301 (1949), is instructive. *Algoma* arose before the enactment of § 14 (b). The Court there held that "§ 8 (3) merely disclaims a national policy hostile to the closed shop or other forms of union-security agreement." *Id.* at 307. Relying on strong

---

[8]On September 25, 2001, Oklahoma voters approved a state right-to-work question, bringing the total to 22 such states.

legislative history, the Court quoted from, among others, Senator Wagner, who stated that "[t]he provision will not change the status quo." *Id*. at 310 (citations and quotations omitted). The Court concluded that the Wagner Act had not swept aside state authority to regulate union security measures, but was enacted, as to these matters, simply to express Congress' judgment that closed shops were not illegal where authorized, and not to declare national policy that they were desirable. The Court found this view of § 8 (3) supported by the subsequent enactment of § 14 (b) in the Taft-Hartley Act. *Id*. at 313-14.

Thus the tribe is not preempted by § 8 (a) (3) from enacting a right-to-work law for business conducted in its reservation. What Congress has not taken away by § 8 (a) (3) it need not give back (by § 14 (b)) in order for the tribe to continue to have authority to pass a right-to-work law. Although the Supreme Court has characterized § 8 (a) (3) as "articulat[ing] a national policy that certain union-security agreements are valid as a matter of federal law," *Oil, Chemical & Atomic Workers, Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 416 (1976), the Court has also made it clear that § 8 (a) (3) was not intended by Congress to be preemptive. *See id.* at 417 (noting § 14 (b) of the NLRA "was designed to make clear that § 8 (a) (3) left the States free to pursue their own more restrictive policies in the matter of union-security agreements") (internal quotations omitted); *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 101 (1963) (noting § 14 (b) of the NLRA

22

was enacted to "mak[e] clear and unambiguous the purpose of Congress not to preempt the field"); *see also Algoma Plywood*, 336 U.S. at 307 (describing the predecessor to § 8 (a) (3) as "merely disclaim[ing] a national policy hostile to the closed shop or other forms of union-security agreement").

The Court has explained that, in enacting § 14 (b), "Congress left the States free to legislate in that field . . . [and thus] *intended to leave unaffected the power to enforce those laws.*" *Schermerhorn*, 375 U.S. at 102 (emphasis added). When Congress enacted § 14 (b), it did not grant new authority to states and territories, but merely recognized and affirmed their existing authority. Congress' silence as to the tribes can therefore hardly be taken as an affirmative divestment of their existing "general authority, as sovereign[s], to control economic activity" on territory within their jurisdictions. *See Merrion*, 455 U.S. at 137.

III

The effect of the Tuscarora case

The NLRB and the Union further urge us to find preemption on the basis of *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960). There a tribe owned property that the Court held was subject to condemnation under the Federal Power Act in order to create a reservoir. The tribe had been using the

23

property as a reservation,[9] but the *Tuscarora* opinion held that Congress had never designated it as such, either by statute or treaty. *Id.* at 121 n. 18.

The Court noted that Congress appeared to have intended that Act to be generally applicable to "lands owned or occupied by any person or persons, including Indians." *Id.* at 118. The Tuscarora Indian Nation had relied on a rule set out in *Elk v. Wilkins*, 112 U.S. 94 (1884) that "[g]eneral acts of congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them." *Tuscarora,* 362 U.S. at 116. The Court explained that, although at one time individual Indians had been considered exempt from laws that did not specifically include them, the rule had since been modified. The Court cited *Superintendent of Five Civilized Tribes v. Comm'r*, 295 U.S. 418 (1935), in which a restricted[10] Creek Indian's investment income was held to be subject to federal income tax under the broad terms of the 1928 Revenue Act, and *Oklahoma Tax Commission v. United States*, 319 U.S. 598 (1943), in which the State of Oklahoma was held to have

---

[9]The lands involved were owned in fee simple by the Tuscarora Indian Nation and no "interest" in them was "owned by the United States" so that they were not within a "reservation" as that term was defined in § 3 (2) of the Federal Power Act.

[10]In keeping with the guardian-ward relationship, the allotted property of certain Indians was subject to the supervision of the United States and could not be freely alienated. They were referred to as "restricted" Indians. *See Chouteau v. Comm'r of Internal Revenue*, 38 F.2d 976, 977 (10th Cir. 1930) (plaintiff Mary Blackbird "is a restricted full-blood Osage. Her property is under the supervising control of the United States."). *See also* Cohen at 650-51 (discussing restrictions).

authority to impose its non-discriminatory estate tax on Indians and non-Indians alike. *Tuscarora* at 116-17. The Court said "it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." *Id*. at 116.

However *Tuscarora* dealt solely with issues of ownership, not with questions pertaining to the tribe's sovereign authority to govern the land. Proprietary interests and sovereign interests are separate: One can own land without having the power to govern it by policy determinations as a sovereign, and a government may exercise sovereign authority over land it does not own. *Tuscarora* mentions no attempts by the tribe to govern the disputed land, nor does it take cognizance of any argument that taking the land would incidentally infringe on tribal sovereign authority to govern. It was the tribe's possessory interest in the land, rather than its sovereign authority to govern activity on the land, that was at stake in *Tuscarora*. The *Tuscarora* Court's remarks concerning statutes of general applicability were made in the context of property rights, and do not constitute a holding as to tribal sovereign authority to govern.

In *Phillips Petroleum Co. v. U.S. Environmental Protection Agency,* 803 F.2d 545 (10th Cir. 1986), we dealt with property rights and reached the conclusion that tribal ownership did not prevent a generally applicable federal statute from regulating activity to ensure the safety of ground water under tribally-owned land.

There, the Osage tribal government's *property interest* was regulated by the Safe Drinking Water Act of 1974 (SDWA), but its *sovereign authority* was not. Far from attempting to exercise its sovereign authority to enact a competing regulation, the tribe supported the federal regulation and indicated its approval by tribal resolution; it was a third party (Phillips Petroleum) that challenged the application of the regulation. *Id*. at 556. Furthermore, the facts differ significantly between that case and the instant one. There, the statute gave delegated authority to the Environmental Protection Agency to promulgate regulations governing underground injection, which threatened to pollute groundwater and endanger the nation's drinking water supply. *Id*. at 547-48.

Other cases have applied the *Tuscarora* principle to Indian tribal governments acting in proprietary capacities. *See, e.g., Florida Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Indians of Florida,* 166 F.3d 1126 (11th Cir. 1999); *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174 (2d Cir. 1996); *Smart v. State Farm Ins.*, 868 F.2d 929 (7th Cir. 1989); and *Donovan v. Coeur d'Alene Tribal Farm*, 692 F.2d 709 (10th Cir. 1982).

Thus *Tuscarora* is not persuasive here. We are convinced it does not apply where an Indian tribe has exercised its authority as a sovereign – here, by enacting a labor regulation – rather than in a proprietary capacity such as that of employer or landowner. In spite of the Board's attempts to bring to our attention multiple cases

26

where the rule was applied to a tribe *qua* sovereign, no citations were found to be apposite.[11] Supp. Brief of the Board at 23 n. 22. Further, *Tuscarora* does not control where, as here, the law is not generally applicable as the exceptions of § 14 (b) show. The exception to § 8 (a) (3) recognized in § 14 (b) indicates that Congress did not intend "inclusion within its general ambit as the norm," *Smart*, 868 F.2d at 933. In view of Congress' intention with regard to this statute, and the federal policy that has long recognized tribal sovereignty, we do not think that *Tuscarora* may be applied to divest a tribe of its sovereign authority without clear indications of such congressional intent which are lacking here. We therefore are convinced that § 8 (a) (3)'s proviso permitting union security agreements does not support divestment of the Pueblo's sovereign authority to enact the right-to-work ordinance.

The exemption of § 8 (a) (3) contemplates that federal law, and particularly the provisions of § 8 (a) (3), may conflict with that of other sovereigns, but intends that federal law give way. *Oil, Chemical & Atomic Workers*, 426 U.S. at 417, (recognizing "a conflict sanctioned by Congress with directions to give the right of way to state laws."). We recognize that § 14 (b) should not be read as granting states and territories general power to supplant federal labor law; states and territories may

---

[11]In *Tuscarora,* 362 U.S. 99, the rule was applied to the tribe as a property owner and not as a sovereign authority. In *Nero v. Cherokee Nation of Oklahoma,* 892 F.2d 1457, 1462-63 (10th Cir. 1989)*,* we found that a generally applicable rule did *not* apply to the tribe as sovereign.

not, for instance, enact laws that exempt their territory from other federal labor regulations. *See id.* at 413 n.7 (finding no suggestion in § 14 (b)'s language or legislative history that types of laws not mentioned in § 14 (b) might be permissible). However neither the Board nor the Union contests the Pueblo's assessment of its right-to-work law as being similar to state right-to-work laws. Brief for Appellee Pueblo of San Juan at 6. There is therefore no showing before us that the Pueblo's right-to-work ordinance is a kind of law that a state or territory might not be permitted to enact and enforce.

Like states and territories, the Pueblo has a strong interest as a sovereign in regulating economic activity involving its own members within its own territory, and it therefore may enact laws governing such activity. *Merrion,* 455 U.S. at 137. *Merrion* illustrates the exercise of sovereign authority (there, to tax) and that sovereign authority exercised was recognized to be "a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status.'" *Id.* at 137 (quoting *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152 (1980)). The legislative enactment of the Pueblo's right-to-work ordinance was also clearly an exercise of sovereign authority over economic transactions on the reservation. This distinguishes the Pueblo's exercise of sovereign authority here from a congressional enactment like that in *Tuscarora* which did not affect tribal legislative policy but

28

instead impacted proprietary interests. This distinction demonstrates why the *Tuscarora* principle, that Indians' proprietary interests may be affected even when Indians are not specifically mentioned, does not apply here where the matter at stake "is a fundamental attribute of sovereignty" and "a necessary instrument of self-government and territorial management . . . [which] derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction." *Merrion*, 455 U.S. at 137.

IV

In sum, we are convinced that Congress did not intend by its NLRA provisions to preempt tribal sovereign authority to enact its right-to-work ordinance and to enter into the lease agreement. The Board and the Union had the burden to establish such intent of preemption, but they did not satisfy their burden. Since they failed to do so, we uphold the tribal right-to-work ordinance. Similarly we see no reason to hold invalid the lease provisions entered into by the Tribe. Accordingly, the decision of the district court is

**AFFIRMED.**

**No. 99-2011, No. 99-2030,** *NLRB v. Pueblo of San Juan*

**BRISCOE,** Circuit Judge, concurring:

I concur. Applying the *Tuscarora/Coeur d'Alene* analytical framework outlined in Judge Murphy's dissent, which I believe to be controlling in this case,[1] the outcome, in my view, turns on the effect of § 8(a)(3) of the NLRA. Although the Supreme Court has characterized § 8(a)(3) as "articulat[ing] a national policy that certain union-security agreements are valid as a matter of federal law," *Oil, Chemical & Atomic Workers, Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 416 (1976), the Court has also made it clear that § 8(a)(3) was not intended by Congress to be preemptive. *See id.* at 417 (noting § 14(b) of the NLRA "was designed to make clear that § 8(a)(3) left the States free to pursue their own more restrictive policies in the matter of union-security agreements") (internal quotations omitted); *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 101 (1963) (noting § 14(b) of the NLRA was enacted to "mak[e] clear and unambiguous the purpose of Congress not to preempt the field"); *see also Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Bd.*, 336 U.S. 301, 307 (1949) (describing the predecessor to § 8(a)(3) as "merely disclaim[ing] a national policy hostile to the closed shop or

---

[1] I agree with Judge Murphy that the majority "offers no logical, precedential, or authoritative support" for its attempt to draw a distinction between a tribe's proprietary and sovereign interests. Dis. at 7.

other forms of union-security agreement").  Based upon these statements, I therefore agree with the majority that § 8(a)(3) does not preempt tribes from enacting right-to-work laws for business conducted on their reservations.

**No. 99-2011, No. 99-2030,** *NLRB v. Pueblo of San Juan*

**LUCERO**, Circuit Judge, concurring.

I join Judge Briscoe's concurrence. I write separately to note my recognition of the potential analytical tension between Parts I, II, and IV of the majority opinion, which I have also elected to join, and the approach set forth in Judge Briscoe's concurrence. Under either approach, the result reached today is mandated by two United States Supreme Court cases, *Retail Clerks International Ass'n, Local 1625 v. Schermerhorn*, 375 U.S 96, 101 (1963), and *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board*, 336 U.S. 301, 307 (1949). These cases do not permit us to entertain the interpretation or result advocated by appellants in this case.

**No. 99-2011, No. 99-2030, *NLRB v. Pueblo of San Juan***


**MURPHY**, Circuit Judge, dissenting:

A majority of this court concludes that Congress did not divest Native American Indian tribes of the power to enact right-to-work laws when it passed §§ 8(a)(3) and 14(b) of the National Labor Relations Act ("NLRA"). The majority supports this conclusion by invoking the general proposition that Congress cannot abrogate Indian self-governance by silence. It then goes on to conclude, however, that Congress, *by its silence*, implicitly granted Indian tribes the right to enact such laws when it passed § 14(b). Because I disagree with the majority's conclusion that § 8(a)(3) did not divest Indian tribes of their power to enact right-to-work laws and with its subsequent conclusion that § 14(b) implicitly granted Indian tribes the same power to enact right-to-work laws granted to states and territories, I respectfully dissent.

It is beyond debate that Indian tribes do not "possess[ ] . . . the full attributes of sovereignty." *United States v. Kagama*, 118 U.S. 375, 381 (1886); *see also Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537, 541 (10th Cir. 1980), *aff'd*, 455 U.S. 130 (1982). Tribes, rather, are quasi-sovereign governments, possessing only "those powers of self-government not voluntarily relinquished by treaty, not divested by Congress in the exercise of its plenary authority over them, or not inconsistent with the superior interest of the United States as a sovereign nation." *Merrion*, 617

F.2d at 541. The Union and the NLRB do not argue that the Pueblo of San Juan ("Pueblo") never possessed the power to enact a right-to-work law or that any such power has either been relinquished by treaty or is inconsistent with the superior status of the United States. Rather, both simply argue that the Pueblo's power has been divested by the exercise of congressional plenary authority over Indian tribes.

The majority does not dispute that Congress retains plenary power over Indian tribes and may exercise that power to divest tribes of their sovereignty. *See* slip op. at 8-9. Further, the majority correctly points out that the burden is on the NLRB and the Union to demonstrate that the Pueblo's power to enact the ordinance at issue here has been "modified, conditioned or divested by Congressional action." *Southland Royalty Co. v. Navajo Tribe of Indians*, 715 F.2d 486, 488 (10th Cir. 1983). The majority then concludes that Appellants have not met their burden of showing that Congress intended to divest the Pueblo of the power to enact the ordinance. The NLRB and the Union, however, have met their burden by demonstrating that the NLRA constitutes comprehensive federal regulation of labor relations. The Pueblo then fails to offer any proof that Congress did not intend for § 8(a)(3) to apply to Indian tribes.

Congress' clear intention to apply a federal statute to Indian tribes can be demonstrated in one of two ways. Congress, of course, may expressly limit tribal sovereignty by including specific language to that effect in the federal statute.

Alternatively, congressional intent to abrogate Indian sovereignty can be discerned from legislative history or from the "existence of a comprehensive statutory plan." *EEOC v. Cherokee Nation*, 871 F.2d 937, 939 (10th Cir. 1989). The conclusion that Congress can abrogate Indian sovereignty by implication is firmly supported by statements made by the Supreme Court in *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960). In *Tuscarora*, the Court declared that "it is now well settled by many decisions of this Court that a general [federal] statute in terms applying to all persons includes Indians and their property interests." *Id.* Though *dicta*, this language indicates the Court's position that the case law supports a presumption that federal statutes of general applicability apply to Indian tribes. *See Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) ("[T]his court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings . . . .").

The Ninth Circuit has expounded on the Court's statement in *Tuscarora*, articulating three exceptions to the general presumption in favor of applicability.

> A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations . . . .

*Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113, 1116 (9th Cir. 1985)

3

(quotations omitted). These exceptions provide Indian tribes with the opportunity to rebut the presumption that they are included in federal statutes of general application.

In *Donovan v. Navajo Forest Products*, this court opined that *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 152 (1982) "limits or, by implication, overrules *Tuscarora*." 692 F.2d 709, 713 (10th Cir. 1992). If *Merrion* did limit the application of *Tuscarora*, those limits are entirely consistent with the exceptions articulated by the Ninth Circuit in *Coeur d'Alene*. Reading *Merrion* as consistent with *Tuscarora* is supported by the opinions issued by this court after *Merrion* and *Navajo Forest Products* in which the court invokes the *Tuscarora* presumption and then considers the *Coeur d'Alene* exceptions. *See Nero v. Cherokee Nation*, 892 F.2d 1457, 1462-63 (10th Cir. 1989); *EEOC v. Cherokee Nation*, 871 at 939; *Phillips Petroleum Co.* v. *EPA*, 803 F.2d 545, 555-56 (10th Cir. 1986). Thus, this court, together with several other circuits, has embraced the *Tuscarora/Coeur d'Alene* approach.

In *EEOC v. Cherokee Nation*, a divided panel of this court concluded that the Age Discrimination in Employment Act ("ADEA") did not apply to Indian tribes. *See* 871 F.2d at 939. Both the majority and the dissenting judge, however, acknowledged that clear congressional intent to abrogate tribal sovereignty could be manifested by the existence of a comprehensive statutory plan. *See id.*; *id.* at 940

4

n.1, 941-42 (Tacha, J., dissenting) (examining legislative history and an analogous federal statute to support the conclusion that the tribe's right to self-government was limited by the ADEA). It is unclear whether the majority based its holding on its view that the ADEA was not a comprehensive federal plan or its conclusion that a treaty between the Cherokee Nation and the United States overcame the *Tuscarora* presumption. *See id.* at 939, 938 n.3.

This court has also invoked the *Tuscarora* presumption to conclude that Congress intended to include Indian tribes within the reach of the Safe Water Drinking Act of 1974 ("SWDA") even though tribes were not expressly mentioned. *See Phillips Petroleum*, 803 F.2d at 556 ("The conclusion that the SWDA empowered the EPA to prescribe regulations for Indian lands is also consistent with the presumption that Congress intends a general statute applying to all persons to include Indians and their property interests."); *id.* at 556 n.14. The court's holding was supported, in large part, by its conclusion that the SWDA "clearly establish[ed] national policy with respect to clean water." *Id.* at 555. The court determined that this national policy would be thwarted if Indian tribes were not covered by the SWDA. It then noted that there was no showing that the SWDA conflicted with a specific right granted to the tribe either by statute or treaty. *See id.* at 556. The majority believes *Phillips Petroleum* differs from this case because, unlike the Pueblo, the Indian tribe in *Phillips Petroleum* did not oppose the application of the

5

SWDA. Under the analysis employed by the *Phillips Petroleum* court, however, the outcome would be the same regardless of whether the issue of tribal sovereignty was raised by an Indian or by a non-Indian. Certainly the majority cannot be suggesting that the outcome in *Phillips Petroleum* would have been different had the theory of tribal sovereignty been raised by the affected tribe rather than Phillips Petroleum. The importance of *Phillips Petroleum* is that it squarely supports the proposition that cases involving comprehensive federal statutes of general applicability should be analyzed by applying *Tuscarora/Coeur d'Alene*.

Other circuit courts of appeal have also concluded that tribes' sovereign powers can be divested by comprehensive federal regulatory schemes that are silent as to their application to Indians. *See*, *e.g.*, *Fla. Paraplegic Ass'n v. Miccosukee Tribe of Indians*, 166 F.3d 1126, 1128-30 (11th Cir. 1999) (concluding that the ADA applies to Indian tribes); *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 177-82 (2d Cir. 1996) (holding that OSHA applied to an Indian tribe); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 932-36 (7th Cir. 1989) (applying ERISA to an employee benefits plan established and operated by an Indian tribe); *Coeur d'Alene Tribal Farm*, 751 F.2d at 1116 (holding that OSHA applied to a tribe's commercial activities). These cases all discussed *Tuscarora* and the exceptions articulated by the Ninth Circuit.

The majority distinguishes *Tuscarora* and its progeny by concluding that the

6

Pueblo's sovereign power to govern by enacting legislation, as opposed to its power to protect any proprietary interests it holds, can never be divested by implication. *See* slip op. at 10-11 ("[I]mplied preemption of such sovereign authority does not suffice."). The majority's position, however, is purely visceral; the majority offers no logical, precedential, or authoritative support for the proposition that a tribe's sovereign power to enact *general legislation* is afforded more protection than any other aspect of its sovereignty. Further, the majority's position conflicts with *Merrion v. Jicarilla Apache Tribe.*

In *Merrion*, the Supreme Court addressed the question of whether Congress implicitly divested an Indian tribe of its power to impose a severance tax, a power of self-governance. *See* 455 U.S. at 150-52. Although the Court ultimately concluded that there was no indication the tribe's power had been abrogated by Congress, it clearly engaged in the very analysis repudiated by the majority in this case. The Court first examined two federal statutes to determine whether they contained any references to Indian tribes. *See id.* at 149-50. It then examined whether any particular provision in the statutes "deprived the Tribe of its authority to impose the severance tax." *Id.* at 149. The Court concluded that the first statute contained express language indicating congressional intent that it not apply to Indian tribes. *See id.* at 150. As to the second statute, the Court noted that although it authorized state taxation of royalties from mineral production on Indian lands, it did

7

not mention tribal authority to tax. *See id.* at 151. In rejecting the claims that the statute transferred the Indian power to tax mineral production to the states, the Court stated as follows:

> This claim not only lacks any supporting evidence in the legislative history, it also deviates from settled principles of taxation: different sovereigns can enjoy powers to tax the same transactions. Thus, the mere existence of state authority to tax does not deprive the Indian tribe of its power to tax.

*Id.*

Although the Court concluded that Congress had not implicitly divested the tribe of its power to impose the severance tax at issue in that case, *Merrion* clearly stands for the proposition that Congress can divest an Indian tribe of a "power of self-government" by implication. 455 U.S. at 152 ("We find no 'clear indications' that Congress has *implicitly deprived* the Tribe of its power to impose the severance tax." (emphasis added)). The Court did *not* conclude that Congress could *never* divest a tribe of such powers by implication.

Like the Supreme Court, this court has also recognized that Congress can divest Indian tribes of sovereign powers of self-government by implication. *See Nero*, 892 F.2d at 1462-63. In *Nero*, this court concluded that a federal statute of general applicability did not divest a tribe of its sovereign power to determine tribal membership and thus exclude plaintiffs from participating in tribal elections and Indian benefits programs. *See id.* at 1463. The court arrived at this conclusion by

8

applying the *Tuscarora/Coeur d'Alene* analysis. It apparently assumed that the federal statute was one of general applicability but then concluded that the statute could not be invoked against the tribe because it would impinge on the tribe's right of self-governance over tribal membership, a purely intramural matter. *See id*. at 1462-63.

The Supreme Court has consistently and unequivocally stated that Congress has plenary authority to divest Indian tribes of *any and all* aspects of their sovereignty, whether those powers were retained by the tribes or established by treaty. "The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is *subject to complete defeasance*." *United States v. Wheeler*, 435 U.S. 313, 323 (1978) (emphasis added). "Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); *see also United States v. Dion*, 476 U.S. 734, 738 (1986) (holding that rights granted to a tribe by treaty may be abrogated by Congress). Even powers over purely intramural tribal matters can be divested by treaty or statute. *See Wheeler*, 435 U.S. at 322 n.18.

The *Tuscarora/Coeur d'Alene* test accommodates notions of both tribal and federal sovereignty. Pursuant to the exceptions first articulated by *Coeur d'Alene*, congressional power to implicitly divest an Indian tribe of sovereign powers is

9

limited in only two circumstances: when the federal statute strips the tribe of its power to regulate purely intramural matters or when the statute divests the tribe of powers guaranteed by treaty.  Only in those two situations must congressional divestiture be express.  Congress can divest Indian tribes of any and all other aspects of their sovereignty by implication, including their power to regulate the activities of non-members, unless the tribe can demonstrate that Congress did not intend the federal statute to apply to them.

The majority's attempt to distinguish the *Tuscarora/Coeur d'Alene* analysis on the basis that it only applies when a federal statute affects property interests and does not apply when a tribe merely invokes its general legislative powers is illogical. If the majority is correct, an Indian tribe, in almost every instance, could avoid the application of a comprehensive, generally applicable federal statute simply by exercising its general legislative powers and enacting an ordinance that either declares the tribe to be exempt from the federal statute or which directly conflicts with the federal statute.  By holding that Congress can never implicitly divest tribes of their power to enact laws that conflict with generally applicable  federal statutes, the majority effectively bestows upon Indian tribes sovereign powers far greater than those possessed even by the states.  As a result of the majority opinion, tribes will now have unfettered power to enact ordinances that directly conflict with any federal statute of general application.  For example, the Pueblo could enact an ordinance

10

legalizing the closed shop, a form of compulsory unionization the majority acknowledges was "outlawed in 1947 by the Taft-Hartley Act's amendment of the NLRA." Slip op. at 6 n.3. The Pueblo could also enact legislation declaring its members to be exempt from all federal tax laws. Such an ordinance would effectively preempt the application of all federal tax laws until Congress remedied the situation by expressly including Indian tribes within the reach of the federal tax laws. This certainly cannot be the rule.

Both the Seventh and the Second Circuits have rejected the majority's reasoning on this very basis. In *Smart*, a member of the Chippewa Tribe argued that ERISA did not apply to an employee benefit plan maintained by the tribe because it affected tribal sovereignty. *See* 868 F.2d at 935. The Seventh Circuit disagreed, stating:

> A statute of general application will not be applied to an Indian Tribe when the statute threatens the Tribe's ability to govern its intramural affairs, but not simply whenever it merely affects self-governance as broadly conceived. Any federal statute applied to an Indian on a reservation or to a Tribe has the arguable effect of eviscerating self-governance since it amounts to a subordination of the Indian government.

*Id.* Similarly, the Second Circuit addressed a nearly identical argument, concluding:

> When taken to its logical limits, it would preclude the application of any federal legislation, silent as to Indians, that in some way affects the political integrity, economic security, or health and welfare of a tribe. Such a test greatly expands the niche the federal government has carved out for Indian tribes; that of a sovereign with limited powers, dependent

11

on, and subordinate to the federal government.

*Mashantucket Sand & Gravel*, 95 F.3d at 179 (quotation omitted).

*Merrion* and *Nero* stand for the proposition that the *Tuscarora/Coeur d'Alene* analysis should be applied to determine whether Congress has, by implication, divested an Indian tribe of any powers it retains. The approach adopted by the Ninth Circuit in *Coeur d'Alene* is consistent with both *Tuscarora* and *Merrion* and provides courts with an appropriate and workable framework within which to analyze the impact of all generally applicable federal statutes on all aspects of Indian sovereignty. The exceptions articulated in *Coeur d'Alene* appropriately limit the *Tuscarora* presumption by preserving tribal sovereignty over purely intramural matters even in the face of comprehensive federal regulation. A limited notion of tribal self-governance preserves federal supremacy over Indian tribes while providing heightened protection for tribal regulation of purely intramural matters. Any concerns about abrogating tribal powers of self-governance by implication are fully addressed by the *Coeur d'Alene* exceptions. The majority has offered no rationale for its position that tribes' powers to enact general legislation occupy the same heights as their more vital powers to regulate purely intramural matters such as tribal membership and domestic affairs.

Congress divested the Pueblo of the power to enact the ordinance at issue here. The Pueblo does not dispute that the NLRA establishes a national labor policy. *See*

12

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 735 (1981) ("The national policy favoring collective bargaining and industrial self-government was first expressed in the National Labor Relations Act of 1935. It received further expression and definition in the Labor Management Relations Act, 1947." (citation omitted)); *Phillips Petroleum*, 803 F.2d at 555 (using the NLRA as an example of a statute that established a national policy); *Navajo Tribe v. NLRB*, 288 F.2d 162, 164 (D.C. Cir. 1961) ("Congress has adopted a national labor policy, superseding the local policies of the States and the Indian tribes, in all cases to which the National Labor Relations Act applies."). Relying on *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board*, however, the majority concludes that § 8(a)(3) does not prohibit right-to-work laws like the one at issue here. *See* 336 U.S. 301 (1949).

*Algoma* cannot be read for the proposition that § 8(a)(3) had no effect on an Indian tribe's power to enact a right-to-work ordinance. In *Algoma*, the Court interpreted § 8(3) of the Wagner Act, which permitted the closed shop before it was amended by the Taft-Hartley Act of 1947.[1] *See id*. at 307-09. Addressing the

---

[1]Section 8(3) of the Wagner Act read as follows:

8. It shall be an unfair labor practice for an employer—
. . . .

(3) By discrimination in regard to hire or tenure of employment or
(continued...)

concern that § 8(3) could be interpreted as outlawing the closed shop, the Court stated, "§ 8(3) merely disclaims a national policy hostile to the closed shop or other forms of union-security agreement." *Id*. at 307. The Court, in part, relied on language from a Senate Report indicating that § 8(3) "deals with the question of the closed shop." *Id*. The Court then quoted a statement made by Senator Wagner that § 8(3) "will not change the status quo. . . . [W]herever it is the law today that a closed-shop agreement can be made, it will continue to be the law. By this bill we do not change that situation." *Id*. at 310. Thus, the language in *Algoma* relied upon by the majority stands only for the proposition that § 8(3) of the Wagner Act did not prohibit states from outlawing closed shops. The "status quo" referred to by the Court was the states' powers to regulate closed shops.

Even assuming that § 8(3) of the Wagner Act had no effect on the rights of all sovereigns to fully regulate union security agreements, the majority fails to acknowledge that § 8(3) was amended by the Taft-Hartley Act of 1947. *See* ch. 120,

---

[1](...continued)
> any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this Act, or in the Nation Industrial Recovery Act . . . or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective bargaining unit covered by such agreement when made.

ch. 372, § 8(3), 49 Stat. 449, 452 (1935).

§ 8(a)(3), 61 Stat. 136, 140-41 (1947) (current version at 29 U.S.C. § 158(a)(3)).  As

amended, the statute regulates more than the closed shop.  Section 8(a)(3)

> add[ed] new conditions, which, as presently provided in § 8(a)(3),
> require that there be a 30-day waiting period before any employee is
> forced into a union, that the union in question is the appropriate
> representative of the employees, and that an employer not discriminate
> against an employee if he has reasonable grounds for believing that
> membership in the union was not available to the employee on a
> nondiscriminatory basis or that the employee's membership was denied
> or terminated for reasons other than failure to meet union-shop
> requirements as to dues and fees.

*Retail Clerks Int'l Ass'n, Local 1625 v.* *Schermerhorn*, 375 U.S. 96, 100 (1963).

Because *Algoma* did not resolve the question of whether § 8(a)(3) of the Taft-Hartley

Act, the statute at issue here, preempted state right-to-work laws, the Court took the

question up in *Schermerhorn*.  Acknowledging that § 8(a)(3) of the Taft-Hartley Act

imposed additional federal restrictions on union security agreements not found in §

8(3) of the Wagner Act, the Court, referring to § 8(a)(3), stated, "In other words,

Congress undertook *pervasive regulation* of union-security agreements, raising in the

minds of many whether it thereby preempted the field . . . and put such agreements

beyond *state* control."  *Id*. at 100-01 (emphases added and citation omitted).

Although the Court ultimately concluded that the state law at issue in *Schermerhorn*

was not preempted by § 8(a)(3), its holding was premised on § 14(b) of the Taft-

Hartley Act, which restored to the states and territories a power otherwise preempted

by § 8(a)(3).  *See id*. at 102.  The exception carved out by § 14(b), however, is

15

extremely narrow; it only permits states and territories to enact legislation prohibiting union security agreements otherwise *allowed* under § 8(a)(3). Section 14(b) does *not* permit even states and territories to enact legislation allowing what § 8(a)(3) prohibits, *e.g.*, the closed shop.

In 1976, the Court unambiguously reiterated its belief that § 8(a)(3) constitutes pervasive federal regulation of union security agreements, stating:

> Section 8(a)(3) of the National Labor Relations Act permits employees as a matter of federal law to enter into agreements with unions to establish union or agency shops. Section 14(b) of the Act, however, allows individual States and Territories to exempt themselves from § 8(a)(3) and to enact so-called "right-to-work" laws prohibiting union or agency shops.

*Oil, Chem. & Atomic Workers, Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 409 (1976) (citations and footnote omitted). The Court went on to state, "§ 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law." *Id*. at 416. This most recent pronouncement by the Court supports the proposition that Congress intended to regulate union security agreements when it enacted § 8(a)(3) of the Taft-Hartley Act, restoring a small portion of that regulatory power only to states and territories when it enacted § 14(b). Thus § 8(a)(3), the statute at issue here, did alter the status quo as it existed before the passage of the Taft-Hartley Act and does constitute pervasive federal regulation of union security agreements.

The ordinance in this case clearly conflicts with the NLRA. Section 8(a)(3) states that employers and unions are not precluded by the NLRA from entering into an agreement requiring employees to become union members within thirty days after beginning employment. *See* 29 U.S.C. § 158(a)(3). The ordinance enacted by the Pueblo specifically prohibits what § 8(a)(3) otherwise allows, *i.e.*, the right of "employers as a matter of federal law to enter into agreement with unions to establish union or agency shops." *Oil, Chem. & Atomic Workers, Int'l Union*, 426 U.S. at 409. Thus, the ordinance is clearly contrary to federal law. Congressional intent to divest the Pueblo of its power to enact the ordinance is thus presumed under *Tuscarora*.

None of the exceptions first articulated in *Coeur d'Alene* apply in this case to overcome the *Tuscarora* presumption. The Pueblo has not identified any treaty with the United States that permits it to enact the ordinance. Additionally, § 8(a)(3) does not touch on the Pueblo's "exclusive rights of self-governance in purely intramural matters." *Coeur d'Alene*, 751 F.2d at 1116 (quotation omitted). Section 8(a)(3) regulates the relationship between employers and their employees. In no sense does § 8(a)(3) impact purely intramural tribal matters which "generally consist of conduct the immediate ramifications of which are felt primarily within the reservation by members of the tribe." *Mashantucket Sand & Gravel*, 95 F.3d at 181. Section 8(a)(3) does not regulate tribal membership, domestic relations, or tribal rules of inheritance, those areas recognized by the Supreme Court as constituting rights of

17

internal self-governance. *See Wheeler*, 435 U.S. at 322 n.18 (acknowledging that even the power to regulate tribal membership, domestic relations, or rules of inheritance can be divested by treaty or statute). In this case, § 8(a)(3) merely curtails the Pueblo's power to regulate the relationship between a non-tribal employer and its employees, both Indian and non-Indian. Although § 8(a)(3) does implicate the Pueblo's power to regulate economic activity on its land, as discussed above, this power, like almost all other powers retained by Indian tribes, can be divested by implication. *See Merrion*, 455 U.S. at 152 (examining whether a tribe's power to impose a tax had been divested by implication). Because § 8(a)(3) does not affect the Pueblo's power to regulate purely intramural matters, the second *Coeur d'Alene* exception does not apply.

Finally, the Pueblo has failed to show that "Congress intended [§ 8(a)(3)] not to apply to Indians on their reservations." *Coeur d'Alene*, 751 F.2d at 1116 (quotation omitted). The majority believes that congressional intent is embodied in § 14(b), which specifically exempts only states and territories from the application of § 8(a)(3). To support this conclusion, the majority relies on the rule of construction that statutes are to be interpreted in favor of Indian sovereignty. Rules of statutory construction, however, can be invoked only when the statute at issue is ambiguous. *See Chickasaw Nation v. United States*, 208 F.3d 871, 880 (10th Cir. 2000), *aff'd*, 122 S. Ct. 528 (2001). Section 14(b) is not ambiguous; it expressly

18

provides that only states and territories may enact legislation prohibiting what § 8(a)(3) otherwise allows. Further, § 14(b)'s silence as to Indian tribes does not render it ambiguous. To conclude otherwise would eviscerate the *Tuscarora* presumption whenever a federal statute of general application contains a limited exception. Under the majority's reasoning, no federal statute containing even the most narrow exception would apply to Indian tribes; congressional failure to specifically include Indian tribes in the exception would, standing alone, constitute proof that Congress intended by that failure to include them. If this were the rule, the general *Tuscarora* presumption that federal statutes of general application apply to Indian tribes would be swallowed by the narrow and specific *Coeur d'Alene* exception in almost every case. For this reason, the majority's approach goes too far. The existence of a statutory exception, standing alone, is insufficient to render a federal statue ambiguous or trigger the application of canons of construction favoring Indian tribes.

The majority's conclusion is fatally undercut by a recent Supreme Court decision. In *Chickasaw Nation v. United States*, two Indian tribes argued that they were exempted from paying federal taxes related to their gaming activities. *See* 122 S. Ct. at 531-32. The tribes asserted that they were entitled to the same exemption from taxation expressly granted to the states. *See id.* The Court disagreed, basing its conclusion on the plain, unambiguous language of the federal statute which did

19

not expressly grant Indian tribes an exemption from the federal taxes granted to the states. *See id*. at 532-33. In light of its conclusion that the statute was unambiguous, the Court refused to apply the canon of statutory construction favoring Indian tribes stating, "to accept as conclusive the canons on which the Tribes rely would produce an interpretation that we conclude would conflict with the intent embodied in the statute Congress wrote." *Id*. at 53.

The majority attempts to distinguish *Chickasaw Nation* on the basis that it did not involve a tribe's power to enact and enforce laws. The broad concepts of statutory interpretation articulated in *Chickasaw Nation*, however, are not confined to the narrow issue before the Court. *Chickasaw Nation* must be read for the broad proposition that courts may not engage in judicial lawmaking by invoking general rules of statutory construction to rewrite otherwise clear and unambiguous statutes. Further, as already explained, a tribe's power to enact legislation that does not impact purely intramural matters is entitled to no more protection than any other tribal power. Accordingly, the Court's analysis in *Chickasaw Nation* applies with equal force to this case. The majority has circumvented congressional intent embodied in the clear and unambiguous language of § 14(b) by invoking a canon of statutory construction. The majority's statement that "in the context of Indian law, appeals to 'plain language' or 'plain meaning' must give way to canons of statutory construction peculiar to Indian law," directly conflicts with the Court's holding in

20

*Chickasaw Nation.* Slip op. at 19.

The majority also relies on *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473 (1999), to support its conclusion that congressional silence implicitly grants Indian tribes the same exemptions and exceptions from federal law afforded states. *See* slip. op. at 20. In *El Paso*, however, the Court concluded that Congress had *implicitly divested* Indian tribal courts of their power to adjudicate tort claims arising from nuclear accidents, an aspect of their self-governance. *See El Paso*, 526 U.S. at 485-87. The Court's holding in *El Paso* is completely consistent with the *Tuscarora* presumption. Read together, *El Paso* and *Chickasaw Nation* clearly stand for the proposition that while Indian tribes can be *divested* of powers of self-governance by implication, those powers cannot be *restored* by congressional silence. The majority reaches the opposite conclusion, thereby turning the law on its head.

There is no evidence in this record of congressional intent to include or exclude tribes from the exemption recognized in § 14(b). The majority necessarily equates this lack of evidence with freedom to legislate by invocation of a canon of construction favoring Indian tribes. The proper conclusion from this lack of evidence of legislative intent, however, is that application of the third *Coeur d'Alene* exception is precluded. Because Indian tribes are not specifically named in § 14(b) and because the Pueblo has not offered any other proof that Congress intended § 8(a)(3) should not apply to Indian tribes, none of the exceptions articulated in *Coeur*

21

*d'Alene* are present in this case.  Thus, Congress implicitly divested the Pueblo of the power to enact the ordinance and I would, accordingly, reverse the order of the district court.